**COMMONWEALTH of Pennsylvania,**
**Appellant**

v.

**Aaron L. JONES.**

Superior Court of Pennsylvania.

Argued Jan. 13, 2009.

Filed July 27, 2009.

Michael W. Streily, Deputy District Attorney, Pittsburgh and Nicole T. Wetherton, Assistant District Attorney, Pittsburgh, for Commonwealth, appellant.

David S. Shrager, Pittsburgh, for appellee.

BEFORE: FORD ELLIOTT, P.J., LALLY–GREEN and ALLEN, JJ.

OPINION BY FORD ELLIOTT, P.J.:

¶ 1 This is an appeal by the Commonwealth from an order granting appellee's motion to suppress. We reverse and remand.

¶ 2 On September 6, 2005, at approximately 10:45 p.m., Detective Edward Fallert, of the Pittsburgh Police Narcotics Division, was on a routine patrol of the Homewood neighborhood in Pittsburgh with two other Pittsburgh Police officers, Detective Mark Goob and Sergeant Snyder.[1] The three police officers were traveling on North Murtland Street in an unmarked vehicle that was equipped with a siren and spotlight. Located at 1005 North Murtland Street was a house known to police to be a location where drugs were frequently consumed by various individuals and also dealt to others.[2] (Notes of testimony, suppression hearing, 1/7/08 at 4–5.)

¶ 3 As the officers approached this location, they were able to observe two men on the front porch. Detective Fallert, who was driving the vehicle, stopped the car in front of the residence and shone the spotlight on the porch area. From its parked position, Detective Fallert estimated the distance from the vehicle to the front porch to be ten feet. As the porch was illuminated by the spotlight, Detective Fallert observed one of the men, subsequently identified as Dewon Edmonds, toss a baggie containing suspected crack cocaine into nearby shrubbery. The officers immediately exited the automobile and approached Mr. Edmonds with the intention of placing him under arrest.

¶ 4 As the officers approached Edmonds and began the process of placing him under arrest, Detective Fallert, who was still seated in the vehicle, observed appellee,

---

**1.** Sergeant Snyder's first name did not appear in the record.

**2.** Detective Fallert testified that they had "served the house on two separate occasions" and been in that residence on a foot pursuit on another occasion. (Notes of testimony, suppression hearing, 1/7/08 at 4.) Detective Fallert further indicated that the house "was a known drug house." *(Id.)*

who was leaning against or sitting upon the porch railing, similarly remove a baggie from his pants and discard it to his left hand side. Detective Fallert exited the vehicle, approached appellee, looked to the area where appellee had discarded the baggie and, upon observing a baggie in the appropriate location, ordered appellee to his feet and placed him under arrest. After handing appellee over to Detective Goob, Detective Fallert retrieved the baggie, which indeed contained a substance resembling crack cocaine, a fact later confirmed by laboratory testing. Both men were then taken into custody. Appellee was subsequently charged with single counts of possession of a controlled substance and possession with intent to deliver ("PWID") a controlled substance.

¶ 5 On June 2, 2006, appellee filed a motion to suppress alleging that the police lacked a basis to conduct an investigative detention and also that illegal police conduct "forced" the abandonment of the contraband subsequently seized. A hearing on appellee's motion was held on January 7, 2008. On March 7, 2008, after consideration of briefs filed by both parties, the court granted appellee's motion to suppress. The Commonwealth subsequently filed a notice of appeal containing certification under Pennsylvania Rule of Appellate Procedure 311(d) that the order appealed from has the effect of substantially handicapping or effectively terminating the prosecution of appellee.

¶ 6 In the present appeal, the Commonwealth asks:

> Did the suppression court err in granting Appellee's Motion to Suppress Evidence by holding that an unconstitutional search and/or seizure occurred where the police, parked on a public street, used a spotlight to illuminate the porch of a residence, known to be a local crack house and not owned by Appellee, but where Appellee was seated, and subsequent to another individual on the porch being arrested, he then discarded contraband from his pocket?

Commonwealth's brief at 5.

■ ¶ 7 Our standard of review in an appeal from the granting of a suppression motion is well established:

> As an appellate court reviewing the ruling of a suppression court, we consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. We must first ascertain whether the record supports the factual findings of the suppression court, and then determine the reasonableness of the inferences and legal conclusions drawn therefrom. The suppression court's factual findings are binding on us and we may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Hayes,* 898 A.2d 1089, 1091–1092 (Pa.Super.2006) (citations omitted). In the present case, appellee did not present any witnesses at the suppression hearing, and the Commonwealth presented only Detective Fallert. Moreover, the findings of the trial court do not reflect disbelief of Detective Fallert but, rather, reflect a question of legal analysis of the scenario presented by Detective Fallert. In such a context, we are presented with a pure question of law over which our standard of review is plenary. *Commonwealth v. Smith,* 575 Pa. 203, 211, 836 A.2d 5, 10 (2003) ("Since the operative facts here are not in dispute, our review is of the legal conclusions below; review of such questions of law is plenary.").

■ ¶ 8 In granting appellee's motion to suppress, the court likened the shining of the spotlight upon the front porch to "searches" found unconstitutional in the

cases of *Commonwealth v. Gindlesperger*, 560 Pa. 222, 743 A.2d 898 (1999), and *Commonwealth v. Lemanski*, 365 Pa.Super. 332, 529 A.2d 1085 (1987). Thus, we begin our analysis of the present case with these two decisions.

¶ 9 In *Lemanski:*

Trooper Dale Cogley of the Pennsylvania State Police received a tip from an informant that plants, suspected of being marijuana, were growing in appellant's greenhouse.... Based on this information, Trooper Cogley drove past the Lemanski residence. From the road he saw a greenhouse, or sun room, connected to Lemanski's home. He also saw plants growing through the greenhouse roof, but, due to the distance, he was unable to identify them. Thereafter, Trooper Cogley and Officer Weidner of the local police department went to the road adjacent to the Lemanski home. With the aid of binoculars and a zoom lens, they identified the plants as marijuana.

Later, Trooper Cogley and Officer Weidner spoke with another citizen informant, who gave them essentially the same information as the first informant. Trooper Cogley and Officer Weidner went back to the Lemanski home to investigate, whereupon they saw two marijuana plants in the greenhouse at close range.

*Id.* at 1087. Notably, Lemanski's house was one of the last residences on a rural, dead-end, dirt road, and the road was approximately 200 feet from the house. *Id.* at 1089. That the greenhouse was secluded from view from the road was borne out by the fact that "in order to view the greenhouse, Trooper Cogley testified that he had to find an opening in the brush and shrubbery along the property line of the house." *Id.* at 1093. The court recognized that the key inquiry was whether or not Lemanski possessed a reasonable expectation of privacy that was violated by the action of the police. In turn, the question whether Lemanski had a reasonable expectation of privacy hinged upon:

(1) whether, by his conduct, the person has 'exhibited an actual (subjective) expectation of privacy;' and (2) whether that expectation of privacy is 'one that society is prepared to recognize as reasonable.' *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

*Id.* at 1091.

¶ 10 The court then further recognized "that a person cannot have a reasonable or justifiable expectation of privacy in things or activities which are generally visible from some public vantage point," [3] *id.,* but went on to hold that although conceivably the marijuana could have been seen from one approaching the front door, the efforts of law enforcement there "constitute[d] an infringement upon [Lemanski's] legitimate expectation of privacy." *Id.* at 1093. The court commented,

[the fact that the greenhouse may have been visible to one approaching the front door of the house] does not justify a police officer's use of binoculars and a zoom lens from a distance of 200 feet. The Fourth Amendment was not intend-

---

**3.** This principle has also come into play in cases dealing with observations made by helicopter or plane, with the prevailing rule of law being that if the aircraft is within "navigable airspace," then there is no infringement upon a reasonable expectation of privacy. However, if police drop under the thresholds delineating navigable airspace, it is deemed an unconstitutional invasion of the curtilage of a home, which extends skyward as well along the plane of the earth. *Commonwealth v. Oglialoro*, 377 Pa.Super. 317, 547 A.2d 387 (1988).

ed to protect citizens from the curious eyes of delivery boys or mere passersby. *Id.* at 1092.

¶ 11 While *Lemanski* involved somewhat surreptitious methods to discern activity within one's home, *Gindlesperger* used higher technology methods from apparently readily accessible viewpoints to accomplish the same thing. In *Gindlesperger,* after receiving tips from a confidential informant ("CI") that Gindlesperger was growing marijuana plants in his basement with the assistance of artificial lighting, members of the Erie County Mobile Drug Task Force utilized an infrared thermal imaging device known as a "WASP" to detect the presence of unexplained heat emanating from the basement.[4] The heat had no readily explainable source, and growing lights were known to produce substantial heat at times, thus the WASP results bolstered the CI's intelligence regarding the marijuana growing operation.[5] Armed with the above information, members of the task force applied for and received a search warrant which, when executed, indeed yielded the discovery of 21 marijuana plants. Gindlesperger moved the court to suppress the results of the search arguing that the use of the WASP device constituted an unconstitutional "search" of the interior of his residence. The trial court disagreed.

¶ 12 However, when appealed to this court, we reversed finding that the warrantless use of the WASP device violated the Fourth Amendment. The Commonwealth appealed to the Pennsylvania Supreme Court, which affirmed the decision of this court. The supreme court indicated that the key to the case was whether Gindlesperger "was able to demonstrate a legitimate expectation of privacy in the heat-generating activities occurring within his home." *Gindlesperger,* 560 Pa. at 232, 743 A.2d at 903. Upon contemplation of that inquiry, the court concluded:

> Like the beeper used by government agents in [*United States v.*] *Karo,* [468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984),] the WASP device employed in this case also revealed critical information regarding the interior of the premises that could not have otherwise been obtained without a warrant. As the *Cusumano* court [*United States v. Cusumano,* 67 F.3d 1497 (10th Cir.1995),] observed,
>
>> the machine intruded upon the privacy of the home not because it records white spots on a dark background but rather because the interpretation of that data allows the government to monitor those domestic activities that generate a significant amount of heat. Thus, while the imager cannot reproduce images or sounds, it nonetheless strips the sanctuary of the home of one vital dimension of its security: the 'right to be let alone' from arbitrary and discretionary monitoring of our actions by government officials.
>
> in that respect, it operates somewhat like a video camera showing heat images.

---

4. The United States Supreme Court described how thermal imagers work in *Kyllo v. United States,* 533 U.S. 27, 29–30, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001):

> Thermal imagers detect infrared radiation, which virtually all objects emit but which is not visible to the naked eye. The imager converts radiation into images based on relative warmth—black is cool, white is hot, shades of gray connote relative differences;

5. As a means of comparison, the police also scanned five other residences "of similar structure and design on either side of the [Gindlesperger] residence and detected no such heat pattern." *Commonwealth v. Gindlesperger,* 706 A.2d 1216, 1218 (Pa.Super.1997).

*Gindlesperger,* 560 Pa. at 237, 743 A.2d at 906.

¶ 13 We cannot agree with the court's reliance on *Lemanski* and *Gindlesperger.* Lemanski resided in a relatively secluded home some 200 feet from the road accessing the home and was surrounded by bushes and shrubbery. With the aid of binoculars and a zoom lens, the police were able to discern that which could not be discerned by the naked eye from a lawful vantage point. Indeed, to even utilize the binoculars with effectiveness, the officers needed to find a hole in the shrubbery to peer through. *Lemanski,* 529 A.2d at 1092–1093. Similarly, in *Gindlesperger,* it was only the intrusive actions of the police that allowed them to discern any activity inside the house.

¶ 14 While we agree with the trial court that a porch in the curtilage of a home is a protected area for Fourth Amendment purposes, here the officers did nothing more than illuminate activity, two individuals standing on the porch of a suspected drug house, which they could already readily observe from a lawful and non-intrusive vantage point, *i.e.,* a public street. We must also disagree with the trial court's determination that use of the police vehicle's spotlight created a more intrusive invasion of privacy than would the use of a flashlight. The installation of a spotlight on a police vehicle serves exactly the same purpose as equipping an officer with a flashlight—both are to be used to illuminate in the dark and for closer observation.

¶ 15 Moreover, case law supports the premise that there is no constitutional impediment to a police officer's use of a flashlight to illuminate the interior of an automobile to better observe articles in plain view. *Texas v. Brown,* 460 U.S. 730, 740, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983) ("Once the vehicle is legally stopped, there is 'no legitimate expectation of privacy, ...,* shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either an inquisitive passerby or diligent police officers."). Appellee's approach would mean that a driver would have no expectation of privacy with regard to an item that was sitting in plain view in the back seat in the daytime but would as day became night. Thus, an officer who peered into the backseat of a vehicle at night with the aid of a flashlight would be violating the Fourth Amendment while an officer who did so in natural sunlight would not. However, case law supports the premise that there is no constitutional impediment to a police officer's use of a flashlight to illuminate the interior of an automobile. *Id.,* *Commonwealth v. Milyak,* 508 Pa. 2, 7, 493 A.2d 1346, 1349 n. 5 (1985). By analogy, we see no constitutional infringement by the police use of a spotlight to illuminate that which is otherwise in plain view on the porch of a house. Consequently, we conclude that the court erred in granting appellee's motion to suppress.[6]

---

**6.** With respect to appellee's claim of "forced abandonment," we note that appellee's motion to suppress did not specify whether it was raising claims under the Fourth Amendment to the United States Constitution or under Article 1, Section 8 of the Pennsylvania Constitution. Of course, the principle of "forced abandonment" is not recognized under the Fourth Amendment, *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690, (1991), although it is under Arti-

cle 1, Section 8. *Commonwealth v. Matos,* 543 Pa. 449, 672 A.2d 769 (1996). While Pennsylvania recognizes the principle of forced abandonment, that legal theory requires that the abandonment of contraband or evidence be precipitated by illegal police conduct. *In the Interest of Evans,* 717 A.2d 542 (Pa.Super.1998). Our analysis above holds that the actions of shining a spotlight upon the porch was not illegal police activity. Thus, regard-

¶ 16 Order reversed. Remanded for trial. Jurisdiction relinquished.

less of the Constitution cited, appellee's

forced abandonment argument fails.