J-S18035-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| | : | |
| | : | |
| RASUL JOHNSON | : | |
| | : | |
| | : | No. 1412 EDA 2022 |

Appeal from the Order Entered April 29, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005831-2021

BEFORE:   PANELLA, P.J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED JULY 14, 2023**

The Commonwealth appeals from the April 29, 2022, order entered in the Court of Common Pleas of Philadelphia County, which granted the pre-trial suppression motion filed by Appellee Rasul Johnson ("Johnson").[1]  After a careful review, we reverse the order granting the suppression motion, and we remand for further proceedings consistent with this decision.

The relevant facts and procedural history are as follows: On June 29, 2021, a criminal Information was filed against Johnson charging him with firearms not to be carried without a license, 18 Pa.C.S.A. § 6106, and carrying

_____

[*] Former Justice specially assigned to the Superior Court.

[1] In its notice of appeal, the Commonwealth certified it took this interlocutory appeal pursuant to Pa.R.A.P. 311(d), and the suppression court's ruling terminates or substantially handicaps its prosecution. ***See Commonwealth v. Holston***, 211 A.3d 1264, 1268 (Pa.Super. 2019) (*en banc*).

firearms in public in Philadelphia, 18 Pa.C.S.A. § 6108. On April 25, 2022, Johnson sought to suppress the physical evidence seized by the police on the following basis:

> [Defense seeks] a motion to suppress any and all physical evidence in this case based on the Fourth Amendment of the United States Constitution, as well as the broader protections afforded by the PA Constitution Article 1, Section 8 under Commonwealth v. Alexander,[2] Your Honor.
>
> We argue that there's no reasonable suspicion to stop the car in this case. There was no probable cause and exigent circumstances or a search warrant to search the car in this case and that the stop was unreasonably extended[.]

N.T., 4/25/22, at 3-4 (footnote added).[3]

At the April 25, 2022, suppression hearing, Philadelphia Police Officer Kwaku Sarpong testified that on April 14, 2021, at approximately 6:42 p.m., he and his partner were on patrol in their police vehicle. *Id.* at 5-7. At this time, it was raining heavily "on and off," and it was "pretty dark outside." *Id.* at 7-8. As they were patrolling the area of Morris Street, the officers observed a white Subaru traveling eastbound with no headlights activated. *Id.* at 6.

_____

[2] There is no dispute defense counsel's reference was to **Commonwealth v. Alexander**, ____ Pa. ____, 243 A.3d 177 (2020).

[3] We note the certified docket entries do not contain a notation that a pre-trial suppression motion was filed in this case, and the record does not contain a pre-trial suppression motion. However, no party has objected to these irregularities. Further, there is no dispute the issues as stated by defense counsel at the beginning of the suppression hearing are the bases upon which Johnson sought suppression of the handgun.

Officer Sarpong testified that, "[a]t this time, I activated lights and sirens and initiated a vehicle investigation on 28 Morris for [a] motor vehicle violation [of] headlights required in adverse weather conditions[.]" *Id.* at 6-7.

Officer Sarpong testified the driver, later identified as Johnson, stopped the Subaru, and Officer Sarpong approached the driver's side door. *Id.* at 7. When he did so, he noticed the Subaru contained a female in the front passenger seat and "had expired emission stickers of 2/21." *Id.* Officer Sarpong asked Johnson for his driver's license, registration, and insurance; however, Johnson was unable to provide any of these documents. *Id.* Johnson told Officer Sarpong that his name was "Russell Johnson." *Id.*

Officer Sarpong testified he returned to the police vehicle and ran the name "Russell Johnson" through the police's department of motor vehicle database ("the database").[4] *Id.* The database returned no results for the name "Russell Johnson." *Id.* at 8. Accordingly, Officer Sarpong returned to the driver's side door of the Subaru and asked Johnson again for his name. *Id.* After Johnson replied, "Russell Johnson," Officer Sarpong spelled the name back to him to ensure he had the correct spelling. *Id.* at 9. Johnson confirmed the spelling, so Officer Sarpong returned to the police vehicle to run the name "Russell Johnson" through the database for a second time. *Id.*

---

[4] Sergeant Andrew Power clarified Officer Sarpong used the Philadelphia Crime Information Center (PCIC) and the National Crime Information Center (NCIC) databases. *Id.* at 33.

Officer Sarpong explained he was attempting to identify Johnson since he was the driver, and the police verify driver identification information as part of a "normal" traffic stop. *Id.*

Officer Sarpong testified that, again, the name "Russell Johnson" returned no results in the database, so he reapproached the driver's side door of the Subaru and spelled the name back to Johnson. *Id.* Again, Johnson confirmed the spelling was correct. *Id.* Again, the name "Russell Johnson" yielded no results in the database. *Id.* at 9-10.

Officer Sarpong testified that, when he returned to the Subaru for a third time, he approached the front passenger's side door and asked the female passenger for her identification. *Id.* at 10. She provided the officer with a Pennsylvania driver's license, as well as a permit to carry a firearm. *Id.* Officer Sarpong indicated that, for the officers' safety, he asked the female passenger if she was carrying a firearm, and she responded in the negative. *Id.*

Officer Sarpong testified that, at this point, Johnson offered to write his name on a piece of paper. *Id.* Thus, Officer Sarpong gave Johnson the piece of paper on which Officer Sarpong had written "Russell Johnson." *Id.* As Johnson began to write his name, Officer Sarpong noticed that Johnson's hand was shaking, and he observed that Johnson "momentarily paused and looked at the spelling of Russell." *Id.* Johnson then wrote the name "Rasol Johnson." *Id.*

Officer Sarpong testified he returned to the police vehicle where he ran the female passenger's name, as well as the name "Rasol Johnson," through the database. *Id.* The female passenger's name returned information indicating she had a valid permit to carry a firearm; however, the name "Rasol Johnson" returned no results. *Id.* Officer Sarpong concluded Johnson was "not being forthright about his name," so he radioed for his fellow officers to bring a fingerprint scanner, which is a mobile identification scanner, to the scene. *Id.* at 10-11. Officer Sarpong's sergeant indicated a fingerprint scanner was on its way. *Id.* at 11.

Officer Sarpong testified he then returned to the driver's side door of the Subaru, and he asked Johnson to "step out of the vehicle." *Id.* Johnson initially refused to comply; however, eventually, Johnson stepped out of the Subaru. *Id.* at 12. When he did so, "[Johnson] had his back towards the vehicle and attempted to walk away from the vehicle, which [resulted in the officer] detain[ing] him." *Id.* Officer Sarpong testified that "[a]t this point,…my sergeant alerted there was a firearm at the driver floorboard. I did not see the firearm initially. My sergeant made the observation." *Id.* He clarified his sergeant did not verbally indicate the discovery of the firearm; but rather, he made a motion, which conveyed to the officers that a firearm had been discovered. *Id.* at 13.

Officer Sarpong testified he attempted to place Johnson in custody, but Johnson resisted with a brief struggle ensuing until the officer could gain

control. *Id.* Officer Sarpong placed Johnson in the back of the police vehicle, and, at this time, Johnson provided the correct spelling of his full name, "Rasul Johnson." *Id.* Officer Sarpong ran the name through the database, and he discovered Johnson did not have a permit to carry a gun. *Id.* Officer Sarpong indicated Johnson was arrested for the weapons violation. *Id.*

On cross-examination, Officer Sarpong clarified he and his partner were patrolling while in uniform and a marked police vehicle on April 14, 2021. *Id.* at 14-15. He also clarified the officers were sitting on 29th Street and observed the Subaru drive across 29th Street on Morris Street without its headlights activated. *Id.* at 17. Officer Sarpong noted the first time Johnson gave the name "Russell Johnson," Officer Sarpong wrote it on a piece of paper without showing it to Johnson to confirm the spelling. *Id.* However, after the database returned no findings for "Russell Johnson," the officer showed Johnson the piece of paper with the name "Russell Johnson" written on it, and Johnson confirmed the spelling. *Id.* at 18. Officer Sarpong reiterated that, the third time he asked for the spelling, he handed the paper to Johnson, who momentarily looked at the spelling of "Russell Johnson" and then wrote "Rasol Johnson." *Id.* Officer Sarpong confirmed that "Rasol Johnson" returned no results in the database, so he radioed for the fingerprint scanner. *Id.* at 19.

Officer Sarpong indicated on cross-examination that it took approximately two minutes for a fellow officer to bring the fingerprint scanner to the scene, at which point Officer Sarpong reapproached the driver's side

door and asked Johnson to exit the vehicle. *Id.* at 20-21. Officer Sarpong confirmed Johnson initially refused to exit the Subaru, but he eventually complied. *Id.* at 22. However, as soon as Johnson exited the vehicle, he immediately "attempted to walk away but [the officer] detained him." *Id.* at 23. Officer Sarpong noted he did not handcuff Johnson at this time, but he did so after his sergeant saw the firearm on the driver's floor and motioned to the other officers that there was a gun. *Id.* Officer Sarpong testified Johnson resisted by refusing to give his hands, but the officer was able to handcuff him and place him in the back of his police vehicle. *Id.*

Officer Sarpong testified the officers "never had a chance to use" the fingerprint scanner since, after Johnson was placed in the back of the police vehicle, he provided his actual name of "Rasul Johnson." *Id.* at 21-23. Thus, Officer Sarpong clarified he did not use the fingerprint scanner or otherwise fingerprint Johnson at the scene. *Id.* at 21. He noted the female passenger was also asked to exit the Subaru, and she complied. *Id.* at 23.

Sergeant Andrew Power testified he responded to the vehicle investigation at issue on April 14, 2021, and he observed Johnson "refusing to exit the vehicle as [the officer] had been asking." *Id.* at 31. He testified that, after Officer Sarpong requested the fingerprint scanner, a fellow officer radioed that he was responding to the location with the scanner. *Id.* at 32. Thus, since Johnson was still refusing to exit the Subaru, Sergeant Power also approached the driver's side door and asked Johnson to exit the vehicle. *Id.*

He noted Johnson, who was being "uncooperative" and "evasive," refused to provide his actual name, and, in fact, he provided the officers with false names for which they could find no record in the database. *Id.* at 33. Sergeant Power testified the police "couldn't find a record of [Johnson,] who's demeanor was way more nervous than anyone should be in that context because of a vehicle investigation. He was shaking. His voice was pitching…just uncomfortably nervous[.]" *Id.* Sergeant Power noticed that Johnson was "sort of shuffling around with his legs" while the police were asking him to exit the vehicle. *Id.*

Sergeant Power indicated that "after multiple requests, and after a couple of minutes," Johnson exited the Subaru. *Id.* Sergeant Power testified that as soon as Johnson stepped out of the vehicle he saw in "plain view" a full-sized pistol on the floorboard near where Johnson's right foot had been. *Id.* at 34-35. He noted he was merely standing outside by the driver's side door when he saw the pistol, and the pistol was not under the seat. *Id.* at 35-36.

Sergeant Power testified "[i]t didn't seem like [Johnson] had notice[d] that [the sergeant] had seen it." *Id.* Sergeant Power indicated he made eye contact with Officer Sarpong, as well as a head motion towards the firearm. *Id.* He indicated that, as soon as Johnson exited the vehicle, he "immediately" tried to walk away, so the officers put their hands on Johnson to stop him. *Id.* at 35. He confirmed that Johnson then provided his correct name, and the police determined he did not have a license to carry a handgun. *Id.* at 36.

Sergeant Power testified that, with the handgun still in the Subaru, he closed the door and directed an officer to remain with the vehicle. *Id.* at 38. He noted the Subaru's doors could not be locked because Johnson did not have a key; but rather, he used an app on his cell phone. *Id.* at 40.

On cross-examination, Sergeant Power confirmed he did not observe the handgun until after Johnson exited the Subaru. *Id.*

Detective Sanna Chang testified she was on duty on April 14, 2021, and she spoke to the arresting and investigating officers. *Id.* at 44. Thereafter, at approximately 11:45 p.m., she went to the vehicle's location and saw the black handgun on the floor of the Subaru. *Id.* She seized the handgun.[5] *Id.*

By order entered on April 29, 2022, the suppression court granted Johnson's motion to suppress the firearm.[6] In so doing, the suppression court stated the following in open court:

> This is a case that I held under advisement on April 25th and had counsel brief this matter. This was due to the fact that during the motion itself, the [suppression] court learned that this case

---

[5] Detective Chang testified that, in response to talking to the arresting and investigating officers, she prepared and executed a search warrant on the Subaru. *Id.* at 43. However, following an objection by defense counsel, the suppression court excluded the testimony about the search warrant because the Commonwealth failed to turn the search warrant over to the defense during discovery. *Id.* at 45-46. Thus, the suppression court held the Commonwealth witnesses were permitted to testify they saw the handgun in plain view; however, the Commonwealth witnesses were not permitted to testify they executed a search warrant and seized the handgun pursuant to the search warrant. *Id.* at 46.

[6] The suppression court filed a written order on April 29, 2022, as well as verbally announced its findings and conclusions in open court.

involved a search warrant, which was never turned over in discovery. Not only was it not turned over in discovery, the Commonwealth also did not have a copy of the search warrant for themselves before initiating the hearing on that date.

In light of that, any mention of a search warrant and the search pursuant to the search warrant were precluded from the testimony. So, the [suppression] court asked that counsel brief the issue because this motion was tried under the presumption that this was a case where a search warrant existed. And the [suppression] court was listening from that viewpoint before learning that this search warrant was never obtained [by the Commonwealth] and passed over.

The [suppression] court asked counsel to address the issue of whether there was any other lawful reason for this search. I got both of your briefs. I'm going to put the findings of fact on here first:

On April 14, 2021, Officer Sarpong testified he was in the area of 2800 Morris Street at 6:42 p.m. when he pulled [Johnson's] car over for driving without headlights. At the time it was—he described it as a rainy day. It was getting dark out, so [Johnson] would need to be driving with headlights, which he wasn't.

The stop was made. And after initiating the stop, Officer Sarpong said he approached [Johnson], asked for his documentation, and he had none. He had no license, registration, or insurance. He gave his name to the officer as Russell Johnson[.] The officer ran that name and did not get any results.

He came back, and he asked for the name again, and [he] was given that name again; still had no results in running that name. He returned a third time, and he asked [Johnson] to write the name down. [Johnson] wrote down "Rasol Johnson", R-A-S-O-L Johnson[.] And the officer ran it the third time, still found no DMV results.

There was a female passenger who he spoke with. She provided information—her information. She had—also had a license to carry a firearm; [however], she told the officer she had no firearm on her.

Because the officer could not determine [Johnson's] name, he asked [Johnson] to step out of the car so he could conduct a fingerprint scan. [Johnson] initially declined or refused to step out of the car. He said that the—Officer Sarpong said that he had to

- 10 -

ask several times for [Johnson] to step out. Eventually, [Johnson] did agree to step out of the vehicle.

At that time, Sergeant Andrew Power noticed, when [Johnson] stepped out of the vehicle, what he believed to be a firearm on the floor of the vehicle. He—the officer—I mean, Sergeant Power saw the firearm near where [Johnson's] feet were located. [Johnson] was then handcuffed and placed in the back of the police vehicle. The passenger was also removed from the vehicle and handcuffed as well.

The vehicle was held at that location in order for the officers to obtain a search warrant to search and seize from the vehicle; specifically, to seize the weapon from the vehicle. However, as noted earlier, the search warrant was never obtained by the Commonwealth prior to the motion to suppress, and it was not passed to [the] defense.

The issue here is not whether there was—the [suppression] court finds that this was a lawful stop of a motor vehicle. And that [Sergeant] Power could see the firearm from a lawful vantage point. The issue is whether he was allowed to seize that item from a lawful vantage point. The [suppression] court, quite frankly, wasn't sure, which is why I asked the two [parties] to brief the issue.

It does seem the Superior Court and the Supreme Court of Pennsylvania has repeatedly held that seizure requires a warrant, which is likely why Sergeant Power went through the trouble of getting the warrant. It's unfortunate because this is a case where they did what they were supposed to do. However, because the ball was later dropped—I don't know why this warrant was never turned over, why it wasn't uploaded to the system, but it seems that the Sergeant got the warrant because he knew he needed the warrant.

Because seeing it does not allow you to seize it, unless there's exigency, which, here, we did not have exigency. He was already in custody. And he didn't have a license to drive, so it was very likely that he wasn't going to be allowed to drive off with that vehicle. It was being held and the warrant was needed.

[T]he Supreme Court of Pennsylvania has set out a test for when you can seize an item without the warrant. And the last prong of the test is that you have to not only be at a lawful point to see the item, but that for the plain view—for a plain view seizure, it requires you to also be able to lawfully access the item.

So, the police in this case, they could lawfully see the item. They did lawfully—the [suppression] court finds that they did lawfully see the item in plain view. However, they didn't have lawful access to seize the item, which is a prong that the Supreme Court of Pennsylvania has set out.

[The Supreme Court has] state[d] that under the Fourth Amendment, an officer may not seize contraband in plain view unless a prior justification provided the officer a lawful right of access to the item. So, the issue is the right of access. It's not seeing it. It's accessing the item. Such as somebody giving them permission to go ahead and get it out, which is why, in cases where the defendant says, yeah, you can search my car, they don't get the warrant, because they have the lawful right of access at that point, but this wasn't a case where that occurred.

[The Supreme Court has also stated] the Fourth Amendment requires a federal constitutional threshold of whether the police had a lawful right of access to the contraband seen in plain view. And we, therefore, hold under both the Fourth Amendment and Article 1 Section 8 is the plain view exception to the warrant requirement—requires the determination of whether the police had a lawful right of access to the object seen in plain view.

So, this whole case is the right of access issue. The [suppression] court finds that there was no exigency, so that is an exception to obtaining a warrant, but it didn't exist here. And that's because there was no lawful right of access, so the item could not be seized. So, I am going to grant the motion to suppress.

This wasn't an invalid search because it wasn't a search. The item was in plain view. The stop was good. There was no unlawful search, but there was an invalid seizure. So, that's the basis for [the suppression court's] ruling.

N.T., 4/29/22, at 3-9.

On May 3, 2022, the Commonwealth filed a timely motion for reconsideration in which it requested the suppression court consider the search warrant, which it attached to the motion for reconsideration. The suppression court denied the motion, and on May 24, 2022, the

Commonwealth filed a notice of appeal to this Court. The suppression court ordered the Commonwealth to file a Pa.R.A.P. 1925(b) statement, and the Commonwealth timely complied. On September 19, 2022, the suppression court filed a Rule 1925(a) opinion indicating it suppressed the firearm since (1) the evidence of the officers obtaining a search warrant was inadmissible at the suppression hearing due to a discovery violation, (2) without evidence of a proper search warrant, and absent probable cause combined with exigent circumstances, the police were unable to seize the handgun from the vehicle pursuant to **Commonwealth v. Alexander**, ___ Pa. ___, 243 A.3d 177 (2020), even though it was observed in "plain view."[7] **See** Suppression Court Opinion, filed 9/19/22, at 3-4.

On appeal, the Commonwealth sets forth the following issue in its "Statement of the Questions Involved" (verbatim):

> Did the lower court err by suppressing a firearm that could properly be seized in plain view from a vehicle where the police—in the excess of caution—nevertheless obtained a search warrant?

Commonwealth's Brief at 3 (suggested answer omitted).

Initially, we note that when this Court reviews a Commonwealth appeal from an order granting a suppression motion, as we are tasked to do here, we may consider only the evidence produced at the suppression hearing, and then

---

[7] The suppression court noted it concluded there was probable cause to search the vehicle, but it concluded there were no exigent circumstances. Suppression Court Opinion, filed 9/19/22, at 3-4.

only that evidence which comes from the defendant's witnesses, along with the Commonwealth's evidence which remains uncontradicted. **Commonwealth v. Barr**, ___ Pa. ___, 266 A.3d 25 (2021). We must determine, in the first instance, whether the suppression court's factual findings are supported by the record, and if they are, we are bound to those findings. **See id.** We must always keep in mind that the suppression court, as the finder of fact, has the exclusive ability to pass on the credibility of witnesses. **See Commonwealth v. Fudge**, 213 A.3d 321, 326 (Pa.Super. 2019). Therefore, we will not disturb a suppression court's credibility determinations absent a clear and manifest error. **Id.** at 326-27.

We must also determine whether the legal conclusions the suppression court drew from its factual findings are correct. **See Barr**, **supra**, 266 A.3d at 39. Unlike the deference we give to the suppression court's factual findings, we have *de novo* review over the suppression court's legal conclusions. **See Commonwealth v. Brown**, 606 Pa. 198, 996 A.2d 473, 476 (2010).

On appeal, the Commonwealth argues that, assuming, *arguendo*, the suppression court properly excluded evidence of the search warrant, the police nevertheless were permitted to seize the handgun from Johnson's vehicle pursuant to the plain view doctrine. The Commonwealth asserts that, contrary to the suppression court's conclusion, **Alexander** is not applicable to the instant case since **Alexander** did not disturb the applicability of the plain view doctrine. That is, the Commonwealth asserts **Alexander** did not import an

exigency requirement into the plain view doctrine or otherwise require a warrant prior to the police's seizure of items in plain view during a valid traffic stop.[8]  After a careful review, we agree with the Commonwealth's assertions.

Recently, this Court held as follows:

> Both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals and their effects and possessions from unreasonable searches and seizures. **Commonwealth v. Heidelberg**, 267 A.3d 492, 502 (Pa.Super. 2021) (*en banc*)[.] "As a general rule, 'a warrant stating probable cause is required before a police officer may search for or seize evidence.'" **Id.** (citation omitted).  Regarding automobiles, "Article 1, Section 8 affords greater protection to our citizens than the Fourth Amendment, and…the Pennsylvania Constitution requires both a showing of probable cause and exigent circumstances to justify a warrantless search of an automobile." **Alexander**, [**supra**,] 243

---

[8] We agree with the suppression court that the initial stop of Johnson's Subaru was valid.  **See Commonwealth v. Bush**, 166 A.3d 1278 (Pa.Super. 2017) (holding for a stop based on an observed violation of the vehicle code or otherwise non-investigable offense, an officer must have probable cause to make a constitutional vehicle stop); 75 Pa.C.S.A. § 4302 (periods for required lighted lamps); 75 Pa.C.S.A. § 4303 (general lighting requirements).  Further, in the context of a vehicle stop, an officer may conduct "mission related" inquiries into the vehicle violations that prompted the stop and incidental matters concerning the safe operation of the vehicle, such as checking the driver's licensure status, the vehicle's registration and insurance status, or whether there are outstanding warrants against the driver. **Commonwealth v. Malloy**, 257 A.3d 142, 150 (Pa.Super. 2021) (citing **Rodriguez v. U.S.**, 575 U.S. 348, 354 (2015)).  Thus, in the instant case, the officers properly sought to determine Johnson's identity. Moreover, an officer may ask whether there are weapons in the vehicle and order the occupants of the vehicle to exit the vehicle as a matter of course without reasonable suspicion of criminal activity. **Id.**; **Commonwealth v. Pratt**, 930 A.2d 561, 564 (Pa.Super. 2007).  Thus, the officers properly asked Johnson to exit the vehicle.  With these legal precepts in mind, we examine the Commonwealth's issue on appeal.

> A.3d at 177[.] "Absent the application of one of a few clearly delineated exceptions, a warrantless search or seizure is presumptively unreasonable." **Heidelberg**, 267 A.3d at 502 (citation omitted). Such exceptions include "the consent exception, the plain view exception, the inventory search exception, exigent circumstances, the automobile exception…the stop and frisk exception, and the search incident to arrest exception." **Commonwealth v. Simonson**, 148 A.3d 792, 797 (Pa.Super. 2016) (citation omitted).

**Commonwealth v. McMahon**, 280 A.3d 1069, 1072 (Pa.Super. 2022).

In the case *sub judice*, the Commonwealth argued in the suppression court, as well as on appeal, that the handgun was properly seized by the police pursuant to the plain view doctrine.

The plain view doctrine is an established exception to the warrant requirement and applies where an object in a vehicle is visible to a law enforcement officer from a lawful vantage point outside the vehicle. **Commonwealth v. Smith**, 285 A.3d 328, 332 (Pa.Super. 2022); **Commonwealth v. Lutz**, 270 A.3d 571, 577 (Pa. Super. 2022); **Heidelberg**, 267 A.3d at 504. As we have long observed, there is no legitimate expectation of privacy shielding the portion of the interior of an automobile that may be viewed from outside the vehicle by either an inquisitive passerby or diligent police officers. **Commonwealth v. Jones**, 978 A.2d 1000, 1005 (Pa.Super. 2009) (citation omitted). **See Heidelberg**, 267 A.3d at 504 ("There can be no reasonable expectation of privacy in an object that is in plain view.").

Three requirements must be satisfied for a warrantless seizure to be constitutional under the plain view doctrine: (1) a police officer must view the

object from a lawful vantage point; (2) it must be immediately apparent to him that the object is incriminating; and (3) the officer must have a lawful right of access to the object. *Commonwealth v. Davis*, 287 A.3d 467, 471 (Pa.Super. 2022); *Heidelberg*, 267 A.3d at 504.

Here, the suppression court suggested, and we agree, that the Commonwealth met the first two prongs of the plain view doctrine. That is, when Johnson exited the vehicle during a lawful traffic stop, Sergeant Power observed the firearm on the floor of the driver's seat by looking in the open door from outside the car on a public street. Standing outside a vehicle on a public street and observing an object in the interior of the vehicle by looking in an open door satisfies the requirement that the object be seen from a lawful vantage point. *See Smith*, 285 A.3d at 333 (observing interior of a vehicle through a window from outside the vehicle constitutes observation from a lawful vantage point); *Heidelberg*, 267 A.3d at 504.

Further, the suppression court found credible Sergeant Power's testimony that he recognized the object on the floor as being a handgun, and prior to seizing the handgun, the police determined Johnson did not have a license to carry a handgun. Also, although Johnson's passenger had a license to carry a handgun, she denied that she was carrying a handgun at that time. Thus, the incriminating nature of the firearm was immediately apparent to the police. *See Davis*, 287 A.3d at 469-70 (indicating the incriminating nature of a firearm is immediately apparent where police observe a firearm in the

driver's seat area and a record check shows that the driver does not have a license to carry a firearm).

However, the suppression court found the Commonwealth did not prove the police had a lawful right of access to the handgun so as to meet the plain view doctrine. In this regard, the suppression court imported an exigency requirement into its plain view exception analysis. That is, the suppression court determined that, under **Alexander**, a warrantless automobile search is unconstitutional unless the search is supported by probable cause and exigent circumstances. Thus, the suppression court reasoned that, in order to have a "lawful right of access" under the plain view doctrine to seize the handgun, the police needed exigent circumstances to conduct a warrantless search under **Alexander**. The Commonwealth argues the suppression court's analysis is flawed. We agree with the Commonwealth.

This Court has held that **Alexander** did not alter the availability of the plain view doctrine as an exception to the warrant requirement or the application of the plain view doctrine. **Davis**, 287 A.3d at 472-73; **Smith**, 285 A.3d at 332; **McMahon**, 280 A.3d at 1073-74. Relevantly, we have held:

> **Alexander** addresses the automobile exception to the warrant requirement, not the plain view exception. **Alexander**, **supra**, **supra**, 243 A.3d at 181[.]

> Our Supreme Court has expressly recognized that incriminating objects plainly viewable [in the] interior of a vehicle are in plain view and, therefore, subject to seizure without a warrant. This doctrine rests on the principle that an individual cannot have a reasonable expectation of privacy in an object that is in plain view.

> ***Commonwealth v. Turner***, 982 A.2d 90, 92 (Pa.Super. 2009)
> (citations and quotation marks omitted). The Pennsylvania
> Supreme Court has distinguished the limited intrusion of the
> seizure of evidence in plain view from the greater intrusion of an
> automobile search. ***Commonwealth v. McCree***, [592 Pa. 238,
> 924 A.2d 621 (2007) (OAJC)].
>
> ***
>
> As discussed above, ***Alexander*** did not involve plain view.
> [There is] nothing in ***Alexander*** which modified the plain view
> doctrine, and we decline to apply ***Alexander***.

***McMahon***, 280 A.3d at 1073-74.

In the case *sub judice*, we agree with the Commonwealth that the

suppression court erred in importing an exigency requirement into its plain

view analysis. Simply put, ***Alexander*** is not applicable here because the

police did not seize the handgun "upon the analytical underpinnings of the

automobile exception to the warrant requirement, but rather upon an

application of the plain view exception." ***McMahon***, 280 A.3d at 1073

(quotation and quotation marks omitted).

Further, with regard to the final prong of the plain view exception, we

agree with the Commonwealth that the police had a lawful right to access the

interior of Johnson's vehicle to seize the handgun. Under the circumstances

described above, the police's observation of the handgun on the driver's side

floor, as well as the confirmation that Johnson did not possess a valid license

to carry a handgun, created probable cause to believe that a crime had been

committed. "Probable cause, in this case, arose suddenly and without any

advance warning that [Johnson] or his vehicle would be the target of a police

investigation." ***Commonwealth v. Liddie***, 21 A.3d 229, 236 (Pa.Super. 2011) (*en banc*). Thus, the police were permitted to seize the handgun, which was in plain view on the floor of the driver's seat area of the vehicle.[9] ***See McMahon***, 280 A.3d at 1074; ***Smith***, ***supra*** (applying ***McMahon*** and finding the plain view exception applied where, following a motor vehicle stop, a firearm was observed and retrieved from the back seat of the defendant's car).

Based on the aforementioned, we conclude the police observed the handgun in Johnson's vehicle during a valid traffic stop, and the handgun was properly seized pursuant to the plain view doctrine. Accordingly, we reverse the order of the suppression court and remand for further proceedings consistent with this decision.[10]

Order reversed; Case remanded; jurisdiction relinquished.

---

[9] To the extent the suppression court suggested the handgun should be suppressed since Sergeant Power did not personally seize the handgun at the scene, we disagree. The undisputed facts reveal the arresting and investigating officers, including the sergeant, conveyed to Detective Chang that the police saw a handgun in plain view during the traffic stop, "the vehicle was held," Detective Chang went to the vehicle, and Detective Chang seized the handgun. Suppression Court Opinion, filed 9/19/22, at 2. Our Supreme Court has recognized that an officer with the requisite probable cause may instruct another officer to act in his or her stead. ***Commonwealth v. Yong***, 644 Pa. 613, 177 A.3d 876 (2018).

[10] In light of the aforementioned, we need not address the Commonwealth's contention the suppression court erred in failing to consider the search warrant.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/14/2023