J-S44041-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NEIL WILLIAMS | : | |
| | : | |
| Appellant | : | No. 441 EDA 2024 |

Appeal from the Judgment of Sentence Entered September 29, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002390-2023

BEFORE: NICHOLS, J., MURRAY, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED APRIL 15, 2025**

Neil Williams ("Williams") appeals from the judgment of sentence imposed following his conviction for prohibited possession of a firearm.[1] He challenges the denial of his motion to suppress. We affirm.

The Commonwealth elicited the following testimony at the suppression hearing. At approximately 9:30 a.m. on February 18, 2023, Sergeant Luke Lesko of the City of Philadelphia Police received a radio dispatch for a reported robbery in the 4300 block of North 8th Street, a location known for "[a] lot of violent crime, robberies, shootings, [and] carjackings[.]" N.T., 7/20/23, at 9-10. The report was for a robbery "at the corner store at 8th and Bristol," and described the actor as a "[B]lack male, black jacket, blue hoodie and jeans."

---

[1] **See** 18 Pa.C.S.A. § 6105(a). Williams was prohibited from possessing a firearm due to a prior conviction for aggravated assault. **See** N.T., 7/20/23, at 49 (stipulation to prior conviction).

*Id*. at 11, 22.  Sergeant Lesko, who was alone, was driving a marked patrol car near the location and arrived within thirty seconds.  He observed Williams, who "matched the description for the radio call for the robbery," standing next to a parked vehicle which was occupied by a female driver on the corner of 8th and Bristol.  *Id*. at 11, 13.  Williams was standing approximately twenty feet from the store, and was speaking to the female driver through the passenger door, which was open.  *Id*.at 25.  The officer stopped his vehicle and approached Williams on foot because he matched the description of the individual identified in the radio call.[2]  *Id*.  As he approached, Sergeant Lesko stated to Williams "hey, hey."  *Id*. at 27.  In response, Williams "immediately began to turn away" from the officer and "was blading his body at a certain angle . . . grabbing the right side of his body, like his waist area."  *Id*. at 13.  Sergeant Lesko noticed that Williams was "kind of guarding his right side, his right waistband area."  *Id*. at 27.  When Williams started to walk away, Sergeant Lesko said "stop."  *Id*. at 27, 29.  At that point, Williams took off running.  *Id*. at 29.  Sergeant Lesko requested backup and pursued on foot, losing sight of Williams after approximately two and one-half blocks.  Other officers quickly arrived in the vicinity, chased Williams to an alley, and observed him throw a firearm to the ground.

---

[2] The trial court noted that Sergeant Lesko's body camera footage from the encounter showed that "[Williams'] clothing does match the flash description exactly."  N.T., 7/20/23, at 39.

- 2 -

The trial court denied suppression following the presentation of the foregoing testimony. The trial court determined the statement of "hey, hey" by Sergeant Lesko was a mere encounter with law enforcement because it "was at most a greeting by the officer to catch [Williams'] attention[,] initiating an informal interaction with a citizen." Trial Court Opinion, 4/25/24, at 6-7. The trial court further determined that an investigative detention occurred when Sergeant Lesko ordered Williams to stop. *See id*. at 7. However, the trial court found that the detention was supported by reasonable suspicion that criminal activity was afoot because Williams matched the radio flash and "continued to blade his body holding his waist then fled the location, giving further rise to reasonable suspicion (unprovoked flight in a high crime area)." *Id*.

Following the denial of suppression, Williams proceeded to a stipulated non-jury trial and the trial court found him guilty of the sole count of prohibited possession of a firearm. The trial court sentenced Williams on September 29, 2023, to six and one-half to thirteen years of incarceration. Williams filed a motion to reconsider on October 9, 2023. On February 2, 2024, Williams filed a premature notice of appeal.[3] Both Williams and the trial court complied with Pa.R.A.P. 1925.

_____

[3] The trial court subsequently entered an order on April 19, 2024, denying Williams' post-sentence motion. We treat the notice of appeal as timely filed from that order. *See Commonwealth v. Enix*, 192 A.3d 78, 79 n.1 (Pa. Super. 2018) (holding that "[i]n accord with Pa.R.A.P. 905(a)(5), we will treat the appeal as filed on the day after the trial court issued the order disposing of [the] post-sentence motion and proceed with our review").

Williams raises the following issues for our review:

1. Whether the trial court abused its discretion in denying [Williams'] pre-trial motion to suppress physical evidence in finding there was reasonable suspicion and/or probable cause to stop, detain, arrest, and subsequently search [Williams.]

2. Whether the trial court erred in denying [Williams'] pre-trial motion to suppress physical evidence where the firearm recovered by law enforcement was a product of forced abandonment after the police initiated a stop of [Williams] in the absence of reasonable suspicion and/or probable cause and thereby unlawfully provoked [Williams'] flight[.]

Williams' Brief at 3 (unnecessary capitalization omitted).

Our standard of review of a suppression ruling is well-settled.

We must determine whether the factual findings of the suppression court are supported by the record, and if there is support in the record, we are bound by the facts and may reverse only if the suppression court's legal conclusions from the facts are in error. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing.

*Commonwealth v. Goldman*, 252 A.3d 668, 677 (Pa. Super. 2021) (citations and quotation marks omitted).

Williams' first issue challenges the lawfulness of the investigative detention. Williams argues that the officer violated his rights under both Article I, Section 8 of our constitution as well as the Fourth Amendment to the United States Constitution. In *Terry v. Ohio*, 392 U.S. 1 (1968), the High Court "recognized an exception to the requirement that Fourth Amendment

seizures of persons must be based on probable cause." ***Dunaway v. New York***, 442 U.S. 200, 208–09 (1979). The ***Terry*** decision involved "a brief, on-the-spot stop on the street" for suspected criminal behavior, and the Court "balanced the limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety." ***Id***. at 209. The Court authorized detainment upon "reasonable suspicion that criminal activity is afoot. In order to determine whether the police had a reasonable suspicion, the totality of the circumstances—the whole picture—must be considered." ***In re D.M.***, 781 A.2d 1161, 1163 (Pa. 2001).

The present case involves a common variation of the "on-the-spot stop on the street" scenario analyzed in ***Terry***: an anonymous tip to the police that a crime has occurred. In such cases, the tip itself does not permit a detention under ***Terry*** because the suspicion of criminal activity arises "not from any observations of [the police] but solely from a call made from an unknown location by an unknown caller." ***Florida v. J.L.***, 529 U.S. 266, 270 (2000). In ***J.L.***, an "anonymous caller reported . . . that a young [B]lack male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." ***Id***. at 268. Officers proceeded to the location and saw J.L., who was wearing a plaid shirt, standing with two other young males. One officer detained J.L. and frisked him, seizing a gun in the process.

The High Court held that J.L.'s Fourth Amendment rights had been violated. The Court explained that "the officers' suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely

from a call made from an unknown location by an unknown caller." *Id*. at 270. The tip "lacked the moderate indicia of reliability present" in other cases involving anonymous tips, because the tip "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *Id*. at 271. The Court rejected the argument that the tipster's accurate description of an individual was sufficient. *Id*. (observing "[t]here really was a young [B]lack male wearing a plaid shirt at the bus stop"). To detain J.L., the tip had to "be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id*. at 272.

With these principles in mind, we address Williams' first claim, which is that Sergeant Lesko failed to sufficiently articulate a basis to conclude that criminal activity was afoot.[4] The trial court determined that an investigative detention occurred when Sergeant Lesko ordered Williams to "stop." Trial Court Opinion, 4/25/24, at 7. The parties agree with this conclusion.[5] *See* Williams' Brief at 5; *see also* Commonwealth's Brief at 9. Where the parties disagree is the significance of Williams' evasive behavior preceding that

_____

[4] We largely discuss federal precedents as "Pennsylvania courts have consistently followed *Terry* in stop-and-frisk cases, including those in which the appellants allege protections pursuant to Article I, § 8 of the Pennsylvania Constitution." *In re D.M.*, 781 A.2d 1161, 1163 (Pa. 2001).

[5] The Commonwealth notes, however, that "the use of the word 'stop' does not necessarily trigger a seizure." Commonwealth's Brief at 9 n.2 (citing *Commonwealth v. Newsome*, 170 A.3d 1151, 1156 (Pa. Super. 2017)). The Commonwealth does not argue that Williams was not seized, as it maintains "there was reasonable suspicion" to justify the detainment. *Id*.

detention and whether the tip was sufficiently corroborated by the attendant circumstances.

Williams views this case as a pure anonymous tipster case. While his brief does not cite **J.L.**, he discusses cases applying its holding, **see Commonwealth v. Hayward**, 756 A.2d 23, 32 (Pa. Super. 2000), and submits that the same logic applies here. Williams argues that "[t]he flash information from the anonymous tip relayed to Sergeant Lesko from police radio lacked a modicum of independent corroboration or verification." Williams' Brief at 7. He also cites **Commonwealth v. Hawkins**, 692 A.2d 1068 (Pa. 1997) (OAJC), which also involved an allegation that an individual was carrying a firearm. In that case, "a Philadelphia police officer responded to a radio call that there was a man with a gun at Sydenham and York Streets." **Id**. at 1069. The tipster supplied a description of the individual's clothing, which Hawkins matched. On that basis, the officer stopped and frisked Hawkins, even though "he did not know the source of the information contained in the radio call." **Id**. Our Supreme Court reversed, explaining that "the fact that a suspect resembles the anonymous caller's description does not corroborate allegations of criminal conduct, for anyone can describe a person who is standing in a particular location at the time of the anonymous call." **Id**. at 1070. Williams submits that the same is true here as the suppression hearing "was utterly void of any testimony to investigate the veracity of the flash information relied upon by Sergeant Lesko" and

accordingly the record fails "to establish the requisite reasonable suspicion to stop and detain" him. Williams' Brief at 7.

We agree with the trial court's legal conclusion that the totality of the circumstances justified the detention. Sergeant Lesko observed Williams standing approximately twenty feet from the store that had reportedly just been robbed, and Williams matched the description of the individual identified in the radio call. The nature of the tip, which involved an in-progress robbery, combined with the short timeframe between the tip and police response and Williams' evasive behavior in response to the police presence, authorized the detainment.

Beginning with the nature of the tip, *J.L.* and *Hawkins* both involved a tip of a man illegally carrying a firearm. As our Supreme Court held in *Commonwealth v. Hicks*, 208 A.3d 916, 937 (Pa. 2019), "there simply is no justification for the conclusion that the mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity." The *J.L.* and *Hawkins* decisions address a case where the purportedly illegal act is ongoing and poses no immediate threat to anyone. Here, the tip involved a store robbery that, by its nature, is ephemeral and the culprit is highly motivated to flee the scene.

Along these lines, "[i]n evaluating the validity of an officer's investigative or protective conduct under *Terry*, the touchstone of our analysis is always the reasonableness in all circumstances of the particular governmental intrusion of a citizen's personal security." *Commonwealth v.*

*Muhammad*, 289 A.3d 1078, 1089 (Pa. Super. 2023). *J.L.* and *Hawkins* held that it is constitutionally unreasonable to detain an individual for investigatory purposes based on an uncorroborated anonymous tip that an individual is illegally carrying a firearm. A tip that a person illegally possesses a firearm is amenable to corroboration in a way that a reported store robbery is not, at least in a case like this one where the described suspect has left the store's premises by the time the police arrive. Furthermore, a claim that a person is carrying a concealed firearm raises the question of how the tipster would know. In contrast, a store robbery is committed in the open, lending credence to the notion that the tipster saw what he or she claimed. This point is illustrated by *Navarette v. California,* 572 U.S. 393, 395 (2014), where a dispatcher relayed to officers a tip that a vehicle ran the reporting party off the road about five minutes ago. The tip described the vehicle and gave its license plate. The Court determined that the tip was sufficiently reliable to credit, distinguishing it from the "bare-bones tip that a young black male in a plaid shirt standing at a bus stop was carrying a gun" in *J.L. Id*. at 398*.* The Court stated the tipster in *J.L.* "did not explain how he knew about the gun[.]" *Id*. Conversely, the tip in *Navarette* "was sufficiently reliable to credit the allegation" that the offending vehicle ran the caller off the roadway. *Id*. "By reporting that she had been run off the road by a specific vehicle—a silver Ford F–150 pickup, license plate 8D94925—the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving. That basis of knowledge lends significant support to the tip's reliability." *Id*. at 399.

Similarly, by identifying a specific store being robbed, the tipster in the instant case implicitly claimed eyewitness knowledge of the crime.

Moreover, when Sergeant Lesko arrived, approximately thirty seconds had elapsed between the flash report and his arrival, and a man matching the suspect's description was standing approximately twenty feet from the store. A heightened need to protect the public from a potentially dangerous felon may call for a different balancing of privacy rights due to exigency, as reflected in the following passage from *J.L.*:

> The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability. We do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk.

*J.L.*, 529 U.S. at 273–74.

We do not suggest that the present circumstances are equivalent to a tip of a person carrying a bomb. But a fresh tip of a robbery poses a far more pressing need for immediate police action than the bare tip of an illegal possession of a firearm. Robbery is by its nature a violent crime in a way that illegally possessing a firearm is not. Firearms can enable dangerous behavior in the future; a reported robber is a threat to public safety based on actual, not theoretical, behavior.

We acknowledge Williams' counterargument, which is that the officer was not required to detain Williams to see if the tip had something to it. Williams' Brief at 14 (arguing that Sergeant Lesko "failed to observe [Williams]

- 10 -

to conduct his own investigation in an effort [to] buttress the constitutionally required reasonable suspicion prior to the attempted seizure of [Williams]"). But, again, the ultimate question is one of reasonableness, and "a case-by-case approach is hardly unique within our Fourth Amendment jurisprudence. Numerous police actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules, including in situations that are more likely to require police officers to make difficult split-second judgments." *Missouri v. McNeely*, 569 U.S. 141, 158 (2013). "*Terry* accepts the risk that officers may stop innocent people," and a *Terry* stop "simply allow[s] the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way." *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000).

Finally, we agree that the evasive conduct in a high-crime area is a pertinent consideration. In *Wardlow*, the United States Supreme Court held that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion" and that "flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id*. at 124. The trial court credited Sergeant Lesko's account that Williams "began to walk away" after Sergeant Lesko initially approached and before saying "stop." Trial Court Opinion, 4/25/24, at 7. The court determined that Williams "continued to blade his body holding his waist then fled the location, also giving further rise to reasonable suspicion

(unprovoked flight in a high crime area)." *Id*. We may not consider Williams' flight in our analysis because that flight occurred **after** he was detained. "[T]he police must have reasonable suspicion at the moment of detention; information developed after a police-citizen encounter moves from consensual to coercive cannot be used to justify the detention." *Mackey*, 177 A.3d at 228. However, as the trial court found, Williams "bladed" his body away from Sergeant Lesko as an "action[] in response to the officer's greeting[.]" Trial Court Opinion, 4/25/24, at 6. Our Supreme Court has defined "blading" as a suspect's "attempt to shield parts of his or her body or clothing from a police officer during a stop," which is a factor to consider "in determining whether there is reasonable suspicion that the suspect is armed and dangerous." *Interest of T.W.,* 261 A.3d 409, 424 n.6 (Pa. 2021). While we are not addressing a suspect's actions during a stop so as to authorize a frisk for weapons, the point remains that blading one's body is an evasive action and is properly considered in our fact-intensive inquiry. *See also Commonwealth v. Foglia*, 979 A.2d 357, 361 (Pa. Super. 2009) (*en banc*) (holding that seizure was justified; officer, after receiving anonymous tip describing man dressed in black possessing a gun in high-crime area, observed man engage in evasive behavior by continually looking back at police, walking away, and touching waistband area before sitting on stoop).

In sum, based on the combination of the nature of the tip, the short time frame between tip and police response, the fact that Williams matched exactly the description of the individual in the radio flash, Williams' location

merely twenty feet from the store which had been reportedly robbed thirty seconds previously, and his evasive behavior towards an officer in a high-crime area, we conclude that the detention was constitutionally reasonable.

We now address Williams' second issue — that the trial court erred in not suppressing the recovered firearm under the theory of forced abandonment. The firearm was recovered by another officer after Sergeant Lesko radioed for backup while pursuing Williams. N.T., 7/20/23, at 48 (stipulation that "Officer Abreu observed [Williams] throw a black handgun to the ground"). Williams' invocation of Article I, Section 8 is significant as "the principle of 'forced abandonment' is not recognized under the Fourth Amendment, although it is under Article 1, Section 8." *Commonwealth v. Jones*, 978 A.2d 1000, 1005 n.6 (Pa. Super. 2009) (citation omitted). Nevertheless, having concluded that Sergeant Lesko lawfully detained Williams, we further conclude that there was no unlawful pursuit. Hence, the gun was admissible. *Commonwealth v. James*, ___ A.3d ___, 2025 WL 615184 (Pa. Super. Feb. 26, 2025) (holding that "because we conclude the encounter remained a lawful investigative detention, for which [the o]fficer . . . possessed reasonable suspicion, we hold suppression under the theory of forced abandonment was improper"). As the suppression court's rulings are supported by the record and are free from legal error, we affirm Williams' judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/15/2025