J-E03003-25

2026 PA Super 114

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| JAMES LEE HERLTH | : | |
| Appellant | : | No. 183 MDA 2024 |

Appeal from the Judgment of Sentence Entered December 7, 2023
In the Court of Common Pleas of York County
Criminal Division at No:  CP-67-CR-0005812-2022

BEFORE:  BOWES, J., OLSON, J., STABILE, J., DUBOW, J., KUNSELMAN, J., NICHOLS, J., MURRAY, J., McLAUGHLIN, J., and BECK, J.

OPINION BY STABILE, J.:                                    **FILED: JUNE 5, 2026**

Appellant, James Lee Herlth, appeals from his judgment of sentence of 7-14 years' imprisonment for possession of controlled substances with intent to deliver ("PWID").  Appellant contends that the trial court erred by denying his motion to suppress evidence that a state trooper found during a warrantless search of a shoebox in Appellant's residence.  We conclude that (1) Appellant had a reasonable expectation of privacy in the contents of the shoebox; (2) the trooper conducted a search by shining a flashlight into a small hole in the shoebox, and (3) the search was improper under the community caretaking and plain view exceptions to the Fourth Amendment. We reverse the order denying suppression, vacate Appellant's judgment of sentence and remand for further proceedings.

On August 31, 2020, the Pennsylvania State Police filed a criminal complaint against Appellant charging him with PWID under 35 P.S. § 780-

113(a)(30). On March 16, 2023, the court presided over a suppression hearing in which the sole witness was Trooper Dylan Adams.

Trooper Adams testified that he had been a trooper with the Pennsylvania State Police for about six years. N.T., 3/16/23, at 4. On August 31, 2020, the trooper was on duty conducting a patrol to respond to calls in the area. *Id.* At around 5:00 a.m., he responded to a report of an overdose at 138 East Broadway in Red Lion, Pennsylvania.[1] *Id.* This address was a duplex, a "single building with two doors." *Id.* at 5. The trooper entered one of the doors into a living room. Three EMS paramedics were already there providing emergency care to Appellant for an overdose. *Id.* at 11. The living room was small, so the trooper could only stand in one spot and spin around in a circle. *Id.* at 6.

Trooper Adams testified that he was present to provide security to EMS personnel because some overdose patients become violent when they are revived with Narcan. *Id.* at 10. When asked whether he was assisting in any medical capacity, Trooper Adams responded, "No, I was not. I'm not medically trained like EMS are. We allow them to do this job." *Id.* He also testified, "We go there to see what [the patient] overdosed on to possibly make an investigation further, anything that's in plain view that we can see." *Id.*

---

[1] The trial court did not make any finding of fact whether this address was Appellant's residence. *Id.* at 26-27 (announcement of court's decision). The Commonwealth acknowledges, however, that this was Appellant's residence, Commonwealth's Brief at 8, 12, 22, so we will accept this as true for purposes of this opinion.

While standing at Appellant's feet, Trooper Adams saw a shoebox with a closed lid.[2]  *Id.* at 6.  The shoebox was "maybe not even a foot away from me.  It was sitting right next to my left leg." *Id.*

The closed shoebox had a one-inch[3] manufacturer's hole.  Trooper Adams shined his flashlight into the hole and recognized "scramble" capsules, a narcotic consisting normally of "a mixture of different drugs but mostly fentanyl." *Id.* at 5.  The scramble was directly under the hole through which he shined his flashlight.  *Id.* at 7.  The Commonwealth does not claim that Trooper Adams could have seen the scramble without a flashlight.  *See* Commonwealth's Brief at 19 ("all Trooper Adams needed to do in order to see the scramble pills in the shoebox was look down **and** shine a flashlight through the manufacturers' hole") (emphasis added).  Nor does the record indicate that the living room was dark or that a flashlight was necessary to see inside the living room.

It "made sense" to Trooper Adams that Appellant overdosed on scramble.  N.T., 3/16/23, at 7.  He "opened the [shoe]box and seized [its contents]," *id.*, 117 scramble capsules in a plastic bag.  *Id.* at 9.

---

[2] The trial court did not make any finding of fact as to whether the shoebox belonged to Appellant. N.T., 3/16/23, at 26-27.  The Commonwealth acknowledges, however, that the shoebox belonged to Appellant and that the box was located where Appellant chose to place it.  Commonwealth's Brief at 13 (Appellant "placed the box. . . in the middle of his living room").

[3] Although Trooper Adams did not testify that the hole was one inch, the court stated that the hole was one inch. *Id.* at 27.  Furthermore, both parties assert in their briefs that the hole was one inch.

At the conclusion of the suppression hearing, the Commonwealth argued that Trooper Adams conducted a valid search under the plain view doctrine. *Id.* at 24-26. The trial court denied Appellant's motion to suppress the evidence seized from the shoebox. *Id.* at 26-27. The court did not find or address whether the trooper shined his flashlight into the shoebox to help EMS personnel provide medical assistance to Appellant. The court simply ruled that the trooper performed a valid search under the plain view doctrine. *Id.*

A jury found Appellant guilty of PWID, and on December 7, 2023, the court entered sentence. On Monday, December 18, 2023, Appellant filed timely post-sentence motions. On January 5, 2024, the court denied these motions. On February 1, 2024, Appellant filed a timely notice of appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises a single issue in this appeal:

> The trial court erred when it denied Appellant's motion to suppress evidence because the drugs and cash found in a closed shoebox in Appellant's home were not in plain view. The officer's use of a flashlight to illuminate the inside of the closed shoebox through a manufacturer's hole in the box to identify the contraband was a search without probable cause and no exception to the warrant requirement applied. The search violated Appellant's rights under the 4th Amendment to the U.S. Constitution and Article I, Section 8 of the Pennsylvania Constitution.

Appellant's Brief at 4.

In reviewing the denial of a suppression motion,

> we are limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Thus, [the] review of questions of law is *de novo*. [The] scope of review is to

- 4 -

consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the suppression record as a whole.

*Commonwealth v. Shaffer*, 653 Pa. 258, 209 A.3d 957, 968–69 (Pa. 2019).

The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . ." U.S. Const., amend. IV. "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). "Protection of reasonable expectations of privacy is the primary purpose of the prohibition against unreasonable searches and seizures." *Commonwealth v. Saunders*, 326 A.3d 888, 896 (Pa. 2024) (cleaned up). A search or seizure conducted without a warrant is presumptively unreasonable, subject to a few specifically established, well-delineated exceptions. *Id.*

We begin by examining whether Appellant had a reasonable expectation of privacy in the shoebox, an issue disputed by the parties to this appeal. A person who challenges a search or seizure on Fourth Amendment grounds must demonstrate (1) that he had a subjective expectation of privacy, and (2) that his subjective expectation of privacy is one that society is prepared to recognize as reasonable and legitimate. *Commonwealth v. Perel*, 107 A.3d 185, 188 (Pa. Super. 2014). The Fourth Amendment

protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated.'

*Payton v. New York*, 445 U.S. 573, 589, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *see also Florida v. Jardines*, 569 U.S. 1, 6, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) ("when it comes to the Fourth Amendment, the home is first among equals"). In addition, "what a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351 (majority opinion).

It also is well settled that "[t]he Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985). "An understanding that personal, private effects are commonly stored in purses, backpacks, luggage, and duffel bags can be gleaned from a casual stroll down any sidewalk. The contents of persons' closed containers are obscured from public view and generally are recognized as private." *Perel*, 107 A.3d at 190.

Based on Appellant's right to be secure in his residence, *Payton*, *Jardines*, and the protection provided to him as an owner of the closed shoebox, *T.L.O.*, *Perel*, Appellant had a reasonable expectation of privacy in the shoebox found in his residence. The Commonwealth contends that Appellant lacked a reasonable expectation of privacy because he placed the closed shoebox in the middle of his living room, where guests were most likely

to see it, instead of his bedroom. Commonwealth's Brief at 13, 15, 65. The plain language of the Fourth Amendment, however, guarantees an individual's right to be secure in his "house". This right extends to his entire house, not merely his bedroom, **Payton**, **Jardines**, and to the curtilage of the house as well. **Commonwealth v. Bowmaster**, 101 A.3d 789, 792 (Pa. Super. 2014). The fact that Appellant placed the closed container in his living room does not mean that he exposed its contents to the public.

The Commonwealth also argues that the one-inch manufacturer's hole "render[ed] the shoebox, even when the lid [was] shut, more analogous to an open or clear container than a closed container," Commonwealth's Brief at 8, making its contents visible to any "casual observer" and leaving Appellant without any reasonable expectation of privacy. **Id.** at 12, 16 (citing **Commonwealth v. Heidelberg**, 267 A.3d 492, 504 (Pa. Super. 2021) (no reasonable expectation of privacy in clear plastic baggies left in plain view in automobile). We do not consider Trooper Adams' inspection of the shoebox "casual observation." The contents of the shoebox were not visible to the naked eye; Trooper Adams had to use a flashlight to peer inside the shoebox and discern its contents. The fact that the lid was closed indicates that Appellant intended to "conceal its contents from plain view." **T.L.O.**, **Perel**, **supra**. We therefore conclude that Appellant in fact possessed a reasonable expectation of privacy in the shoebox whose contents were not open or visible to any "casual observer".

Having determined that Appellant had an expectation of privacy in the contents of the shoe box, we next examine whether Trooper Adams performed a search of the shoebox. The Commonwealth argues that he did not:

> Trooper Adams, from a lawful vantage point in [Appellant's] residence pursuant to the emergency aid exception, merely shined his flashlight into the manufacturer's hole of a shoebox laying beside [Appellant]. He did not manipulate or disturb the shoebox in any way prior to illuminating it with his flashlight. He didn't even need to bend over or maneuver his body in any way to recognize the illuminated contraband through the manufacturer's hole in the shoebox … [T]rooper Adams' mere use of a flashlight was not a search.

Commonwealth's Brief at 22.

We disagree. Trooper Adams' act of shining a flashlight into the hole of the closed shoebox was a search. "A search takes place when police intrude upon a constitutionally protected area without the individual's explicit or implicit permission." *Commonwealth v. Prater*, 256 A.3d 1274, 1286 (Pa. Super. 2021) (citing *Jardines*, 569 U.S. at 6). "[I]f contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point." *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

Trooper Adams was inside Appellant's residence for a proper reason, namely, to provide security to EMS personnel while they provided medical

treatment to Appellant. Thus, the trooper viewed the shoebox from a lawful vantage point inside Appellant's living room. At that point, however, he performed a search by shining a flashlight into a small hole of a closed container found inside the living room, a "constitutionally protected area" in which Appellant had a reasonable expectation of privacy. *Prater*, 256 A.3d at 1286.

We are not aware of any Pennsylvania decision that addresses whether a law enforcement officer conducts a search by shining a flashlight inside a residence into a small hole of a closed container. Although the parties refer us to two Pennsylvania cases in which police officers used technological aids outside of residences to inspect residential interiors, the facts in those cases bear little resemblance to the present case. *See Commonwealth v. Lemanski*, 529 A.2d 1085 (Pa. Super. 1987); *Commonwealth v. Gindlesperger*, 560 Pa. 222, 743 A.2d 898 (1998).

In *Lemanski*, police observed marijuana growing in a secluded greenhouse approximately 200 feet from the road by finding an opening in the brush and shrubbery along the property line of the house and using binoculars and a zoom lens through the opening. We held that the search violated the Fourth Amendment, because the police infringed upon the homeowner's reasonable expectation of privacy by peering through a hole in the shrubbery with sophisticated technology from a distance of 200 feet. *Id.*, 529 A.2d at 1092-93. Subsequently, in *Gindlesperger*, the police received

tips from a confidential informant that the defendant was growing marijuana in his basement with artificial lighting. The police used an infrared imaging device called a "WASP" to detect the presence of unexplained heat emanating from the basement.[4] They then obtained a search warrant that resulted in seizure of marijuana from the basement. Our Supreme Court held that use of the WASP ran afoul of the Fourth Amendment by violating the defendant's reasonable expectation of privacy "in the heat-generating activities occurring within his home." *Id.*, 743 A.2d at 903. We do not consider these decisions on point, because the vantage point for the searches in these cases was outside the residence instead of inside, and the technology used in these cases was far more sophisticated than the flashlight herein.[5]

In our view, the most persuasive decisions on the issue before us are from other jurisdictions: *State v. Tarantino*, 322 N.C. 386, 368 S.E.2d 588 (1988), and *People v. Hagestedt*, 2025 IL 130286, 270 N.E.3d 334 (2025).[6]

_____

[4] The opinion in *Gindlesperger* does not explicitly state that the police were outside the defendant's residence at the time they used the WASP, but it is reasonable to infer this from the circumstances of the case. Had they been inside the residence, they could have viewed the plants with their own eyes and would not have needed to use the WASP.

[5] The Commonwealth cites many other cases for the proposition that Trooper Adams did not perform a search. We discuss these cases, *infra*.

[6] "When confronted with a question heretofore unaddressed by the courts of this Commonwealth, we may turn to the courts of other jurisdictions. Although we are not bound by those decisions, we may use decisions from other jurisdictions for guidance to the degree we find them useful and not

*(Footnote Continued Next Page)*

In *Tarantino*, a police detective (Detective Baker) received a tip that marijuana plants were growing inside a building. The front door of the building was padlocked, the back doors were nailed shut, and the windows were boarded up. There were, however, quarter-inch cracks in a wall left uncovered by wooden boarding. Detective Baker shined a flashlight through the cracks and saw marijuana plants. He obtained a search warrant and seized the marijuana.

The trial court granted Tarantino's motion to suppress on the ground that Detective Baker conducted a search with his flashlight that violated his Fourth Amendment rights. The North Carolina Supreme Court affirmed. The court distinguished Tarantino's case from *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), in which DEA agents shined flashlights into an "essentially open front" of the defendant's barn[7] and saw a drug laboratory. *Id.* at 305. The *Dunn* court held that the DEA agents did not violate the Fourth Amendment because the barn's interior was exposed to the public from an unprotected vantage point. *Id.* at 304-05. The officers were not required to "shield their eyes" from that which was exposed to public view. *Id.* at 304. In contrast,

_____

incompatible with Pennsylvania law." *Commonwealth v. Choice*, 345 A.3d 719, 733 n.18 (Pa. Super. 2025).

[7] There was a locked waist-high gate barring entry into the barn proper, but the interior of the barn was visible because there only was netting material between the top of the gate and the ceiling. *Id.*, 480 U.S. at 297.

- 11 -

[Tarantino] had a reasonable expectation of privacy in the building which Detective Baker inspected. The building's padlocked front door, nailed back doors, and boarded windows indicate that [Tarantino] had a subjective expectation of privacy in his building's interior. This expectation was not unreasonable even though there were small cracks between the boards in the building's back wall. The presence of tiny cracks near the floor on the interior wall of a second-floor porch is not the kind of exposure which serves to eliminate a reasonable expectation of privacy. To hold otherwise would result in an unfairly exacting standard. It would require owners of non-residential buildings who want to enjoy their Fourth Amendment rights to maintain their structures almost as airtight containers. The Supreme Court has never imposed such a standard, and we decline to do so in this case.

Nothing in the Supreme Court's **Dunn** decision suggests that an expectation of privacy is eliminated by quarter-inch cracks in the back wall of an otherwise sealed building. The inquiry in **Dunn** centered on the Fourth Amendment's requirements when law enforcement officials are faced with an open barn front obstructed only with see-through netting. The barn's interior was fully exposed to anyone standing next to the netting…

By contrast, in the instant case, Detective Baker confronted a nearly solid wall when he entered [Tarantino]'s porch. Boarded windows and nailed doors prohibited observation of the inside from all but the most rigorous scrutiny. To make his observations, Detective Baker had to bend and peer with a flashlight through quarter-inch cracks near the floor. Nothing indicates, as in **Dunn**, that had Detective Baker conducted his investigation during the day he could have viewed the building's interior without making the same searching inquiry. These facts distinguish this case from **Dunn** in a constitutionally significant way. Far from demanding Detective Baker to avert his eyes to avoid viewing the building's interior, the cracks near the porch floor required him to make a probing examination in order to see inside. Under these circumstances [Tarantino]'s reasonable expectation of privacy remained intact.

*Id.*, 368 S.E.2d at 591-92.

The **Tarantino** court further observed:

Our decision is consistent with those of other jurisdictions. In ***United States v. Bradshaw,*** the Fourth Circuit held that the defendant's reasonable expectation of privacy in his truck's interior was not eliminated by the presence of a crack where the back doors did not fit snugly. 490 F.2d 1097, 1101 (4th Cir.)… The court concluded that police officers violated the Fourth Amendment when they looked through the crack without a warrant, saw moonshine whiskey jugs, and seized them. The court acknowledged that the officers had a right to approach and stand next to the truck, but it concluded they went beyond lawful investigation when peering through the small space. ***Id.*** In ***State v. Kaaheena,*** the Hawaii Supreme Court concluded the defendant's Fourth Amendment rights were violated when the police stood on a crate and looked through a one-inch hole in the drapes and blinds of a building which housed a "commercial establishment and some rental apartments." 59 Haw. 23, 575 P.2d 462, 466 (1978). Although the police made their observations from a public vantage point, the court held that the search was impermissible because the defendant maintained his reasonable expectation of privacy in the building's interior. ***Id.***, 575 P.2d at 467; ***see also Kroehler v. Scott,*** 391 F.Supp. 1114 (E.D.Pa.1975) (violation of Fourth Amendment for officers to peer through small ceiling vents); ***Lorenzana v. Superior Court of Los Angeles County,*** 9 Cal.3d 626, 108 Cal.Rptr. 585, 511 P.2d 33 (1973) (officers violated Fourth Amendment by peering through drawn curtains); ***People v. Triggs,*** 8 Cal.3d 884, 106 Cal.Rptr. 408, 506 P.2d 232 (1973) (illegal search where officers in maintenance access area peered through vents); ***People v. Lovelace,*** 116 Cal.App.3d 541, 172 Cal.Rptr. 65 (1981) (reasonable expectation of privacy not eliminated by knotholes and cracks in six foot high wooden fence); ***State v. Biggar,*** 716 P.2d 493 (1986) (reasonable expectation of privacy not eliminated by crack one half to one inch wide where toilet stall door did not close properly).

***Id.*** at 592-93 (cleaned up).

The critical point in ***Tarantino*** was that a small hole in an otherwise closed building does not defeat the defendant's reasonable expectation of privacy in the building's interior. Police intrusion into such an area via flashlight constitutes a search under the Fourth Amendment. Analogously, a

small hole in a closed container inside an individual's residence does not defeat his reasonable expectation of privacy in the container. Thus, shining a flashlight into the hole, as Trooper Adams did here, constitutes a search.

*Hagestedt* is equally as persuasive as *Tarantino*. Police officers in *Hagestedt* entered the defendant's residence without a warrant to assist the fire department in investigating a reported gas leak. One of the officers examined the stove and saw no damage. He observed a cabinet across from the stove that was secured shut with a chain and padlock. The cabinet was ajar about one inch. The officer shined his flashlight through the gap and saw marijuana in a container inside the cabinet. *Id.*, 270 N.E.3d at 338. A second officer pulled on the cabinet door handles, and the doors opened another inch or two. *Id.* at 339. The second officer looked inside and saw marijuana inside a container. *Id.* The trial court denied the defendant's motion to suppress. The court held that the first officer's act of shining a flashlight was valid under the plain view doctrine. *Id.* The court ruled that the second officer's act of pulling the cabinet open further constituted an illegal search in violation of the Fourth Amendment, but the error was harmless because the first officer had spotted marijuana during the flashlight search. *Id.* Subsequently, the defendant was convicted of possession of a controlled substance.

The Illinois Supreme Court held that the defendant had a reasonable expectation of privacy in the cabinet. *Id.* at 343 ("[b]y chaining and locking a cabinet in his kitchen, defendant took actions to protect his privacy and had

shown that he sought to preserve the contents of the cabinet as private…Society recognizes as reasonable a defendant's expectation of privacy in items concealed from plain view in closed containers, especially in a defendant's own home").  The court cited **Tarantino** for the principle that "a defendant's reasonable expectation of privacy is not eliminated by small openings in otherwise closed areas."  **Id.** at 347.

The court also held that the officers performed a search of the cabinet. The court found instructive the United States Supreme Court's analysis in **Arizona v. Hicks**, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).  In **Hicks**, police officers responded to the defendant's apartment after a bullet was fired through the floor of his apartment, striking and injuring a man in the apartment below.  Police officers entered the apartment, searching for the shooter, other victims, and weapons.  While in the apartment, one of police officers noticed expensive stereo components that seemed out of place.  The officer moved some of the components and read and recorded their serial numbers.  One item was seized immediately as stolen, while the remaining components were seized later pursuant to a warrant.  The defendant filed a motion to suppress all seized evidence.  The trial court suppressed the evidence, and a state appellate court affirmed, finding that the officer's act of obtaining the serial numbers was an additional search unrelated to the exigent circumstance of the shooting.  The United States Supreme Court affirmed. The Court reasoned that merely inspecting the parts of the stereo components

that were visible, while lawfully in the apartment, would not be an independent search because "it would have produced no additional invasion of defendant's privacy interest." *Id.* at 325. When the officer moved one of the components to view a concealed serial number, however, he conducted a search. *Id.* at 324-25 ("taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of defendant's privacy unjustified by the exigent circumstance that validated the entry").

The Illinois court emphasized that although *Hicks* concerned stereo equipment that was moved to expose the serial number, its holding was not limited to whether the components were moved. Instead, said the Illinois court, *Hicks* found that there was a new invasion of the defendant's privacy when the officer took action that was "unrelated to the objectives of the authorized intrusion." *Hagestedt*, 270 N.E.3d at 345-46 (citing *Hicks*, 480 U.S. at 325).

The *Hagestedt* court held that the officer who shined a flashlight into the kitchen cabinet, like the officer in *Hicks*, took action that was unrelated to the original objective for entering the defendant's house. The original reason for entering the house, investigation of a reported gas leak, was a proper community caretaking or public safety exception to the Fourth Amendment. *Id.* at 344. By shining a flashlight into the cabinet, however, the officer "took deliberate action that was unrelated to his authorized

intrusion[,] [and this] constituted an independent search." ***Id.*** at 347. The court elaborated:

> While the cabinet itself was in plain view, its contents were not. The cabinet was secured with a chain and a padlock, and the chain was wrapped tightly around the cabinet handles. Neither [officer] observed the contents of the cabinet prior to taking any action. [The second officer's] action was to open the doors further, which the trial court correctly determined was a search. [The first officer's] action was to use his flashlight and an angled view through a small gap in an otherwise closed and locked cabinet. There was also no evidence that the gas leak was potentially coming from the locked cabinet…Thus, [the first officer] was not looking for a gas leak in the cabinet, nor was the cabinet proximate to the stove so that the use of a flashlight to illuminate behind the stove would have illuminated the interior of the cabinet. There was no testimony that the flashlight in this case was necessary to investigate the gas leak…Rather, the officer saw an admittedly suspicious cabinet, locked with a chain, and used his flashlight to try to see in through a small gap.

***Id.*** at 347-48.

Trooper Adams' conduct was similar to the conduct of the officer in ***Hagestedt*** who shined a flashlight into the kitchen cabinet. The officer in ***Hagestedt*** properly entered the defendant's residence due to an emergency (the gas leak), but his act of shining a flashlight into the kitchen cabinet was "unrelated to his authorized intrusion" and thus constituted an independent search. ***Hagestedt***, 270 N.E.3d at 347. Similarly, Trooper Adams properly entered Appellant's residence due to an emergency (Appellant's overdose), but his act of shining his flashlight into a hole in the shoebox was unrelated to "the objectives of [his] authorized intrusion." ***Id.*** Shining his flashlight thus

constituted "an independent search," *id.*, into an area where Appellant enjoyed a reasonable expectation of privacy. *Id.* at 343.

The decisions cited by the Commonwealth for the proposition that Trooper Adams did not perform a search, *see* Commonwealth's Brief at 21-32, are distinguishable, because the police in those cases intruded into areas in which the defendant did not enjoy a reasonable expectation of privacy, such as plainly visible automobile interiors or other locations visible from lawful vantage points.

For example, in *Commonwealth v. Milyak*, 508 Pa. 2, 493 A.2d 1346 (1985), our Supreme Court held that officers properly seized stolen items that they observed in a vehicle with the aid of a flashlight. *Milyak* held that "no search triggering the protection of the Fourth Amendment is conducted where an officer observes the plainly viewable interior of a vehicle," because

> there is no reason [a police officer] should be precluded from observing as an officer what would be entirely visible to him as a private citizen. There is no legitimate expectation of privacy ... shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.

*Id.*, 493 A.2d at 1348. Under the Fourth Amendment, however, "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home…" *Commonwealth v. Gary*, 625 Pa. 183,

91 A.3d 102, 111 (2014).[8]  Thus, *Milyak* does not apply to the search herein of a closed container inside Appellant's residence.  Multiple other decisions cited by the Commonwealth are inapplicable for the same reason.  *See Texas v. Brown*, 460 U.S. 730, 733, 103 S.Ct. 1535, 75 L.Ed.20 502 (1983) (plurality opinion) (officer shined flashlight into car and observed balloon containing drugs); *Commonwealth v. Merkt*, 600 A.2d 1297, 1299 (Pa. Super. 1992) (citing *Milyak*) (officer shined flashlight into vehicle and saw gun); *see also United States v. Poller*, 129 F.4th 169, 175 (2nd Cir. 2025) (officer shined flashlight into car); *United States v. Harper*, 488 Fed. Appx. 63, 66-67 (6th Cir. 2012) (same); *United States v. McCoy*, 824 F. Supp. 467, 475 (D. Del. 1993) (same); *People v. Dickinson*, 928 P.2d 1309, 1312 (Colo. 1996) (same); *Commonwealth v. Sergienko*, 503 N.E.2d 1282, 1285-86 (Mass. 1987) (same).

Other decisions cited by the Commonwealth are distinguishable because the police officers shined lights from a public place or lawful vantage point into an area or on an object in which the defendant did not have a reasonable expectation of privacy.  *See United States v. Lee*, 274 U.S. 559, 563, 47 S.Ct. 746, 71 L.Ed.2d 1202 (1927) (Coast Guard vessel shined searchlight

---

[8] Our Supreme Court has held that individuals enjoy a greater expectation of privacy in their automobiles under Article I, Section 8 of the Pennsylvania Constitution than under the Fourth Amendment.  *Commonwealth v. Alexander*, 664 Pa. 145, 243 A.3d 177, 202-03 (2020).  The present discussion, however, does not concern Article I, Section 8.

onto deck of motorboat 24 miles off Massachusetts coast, illuminating cans of alcohol; "there was [no] exploration below decks or under hatches"); ***Commonwealth v. Jones***, 978 A.2d 1000, 1005 (Pa. Super. 2009) (shining spotlight at night onto front porch of residence ten feet away did not violate Fourth Amendment; spotlight was shined from lawful vantage point on public street, and illuminated area would have been in plain view in daytime); ***United States v. De Jesus Cruz-Mendez***, 467 F.3d 1260, 1263, 1266 (10th Cir. 2006) (officer lawfully inside residence observed cell phone in plain view and shined flashlight on its dark screen); ***United States v. Law***, 384 Fed. Appx. 121, 123-24 (3rd Cir. 2010) (police officer lawfully inside apartment to investigate domestic argument shined flashlight into open bag partially inside open closet); ***State v. Johnson***, 171 N.J. 192, 793 A.2d 619, 630 (2002) (police officers investigating report of drug-dealing at night shined flashlight and searchlight from public street; officer holding flashlight observed defendant place object in support post of porch; without losing sight of post, officer walked onto porch, shined flashlight into post, and found container with drugs inside); ***State v. Rose***, 128 Wash.2d 388, 909 P.2d 280, 283-85 (1996) (officer who was lawfully on front porch of residence shined flashlight through unobstructed window and saw drugs inside; no reasonable expectation of

privacy under these circumstances, and use of flashlight did not transform observations into a search).[9]

For these reasons, the decisions advanced by the Commonwealth fail to convince us that Trooper Adams did not perform a search.

The dissent maintains that Trooper Adams did not perform a search. The dissent observes that the officers in **Hagestedt** and **Tarantino** had to "strain themselves and move their bodies, in addition to using a flashlight, in order to see items secreted behind solidly closed objects." Dissent at 9. Trooper Adams, the dissent continues, "simply illuminated his flashlight." **Id.** at 11. "The use of a flashlight to brighten an object," the dissent concludes, "is not, by itself, a 'search' as that term is used for constitutional purposes." **Id.** at 9. We disagree for two reasons.

First, we believe the dissent misinterprets **Hagestedt** and **Tarantino** by asserting that that the items in these cases were "secreted behind solidly closed objects." Dissent at 9. The objects were not solidly closed. There were small holes through which the officers in these cases shined flashlights, just as there was a small hole through which Trooper Adams shined his flashlight.

_____

[9] This Court reached a result similar to **Rose** in **Commonwealth v. Shannon**, 467 A.2d 850 (Pa. Super. 1983), a decision not cited by the Commonwealth. **Id.** at 852 (where officers were lawfully in driveway and observed fight through kitchen window, "the occupants' failure to close [the] window largely negates their expectation of privacy").

- 21 -

Furthermore, and perhaps even more importantly, the dissent concedes that Appellant had a reasonable expectation of privacy in the contents inside the shoebox. *Id.* at 3. The shoebox was closed, reflecting an attempt to conceal its contents from view. There is no evidence that Trooper Adams could see the contents inside the shoebox with his naked eye. He had to use his flashlight to look through a small hole in the shoebox to see its contents. To borrow the dissent's euphemisms, even if he did not "strain himself" or "move his body," his use of an artificial aid to "brighten" the shoebox interior still constituted an unlawful search into an area in which Appellant enjoyed a reasonable expectation of privacy. *See Prater*, 256 A.3d at 1286 (search occurs when "police intrude upon a constitutionally protected area without the individual's explicit or implicit permission").

The Commonwealth next argues that Trooper Adams' presence in the Appellant's residence under the community caretaking doctrine to render emergency aid gave him a lawful right of access to the shoe box. We agree that Trooper Adams was authorized to enter Appellant's residence without a warrant under the community caretaking doctrine, a narrow exception to the Fourth Amendment. We conclude, however, that Trooper Adams' search of the shoebox exceeded his authority under the community caretaking doctrine.

This Court has defined the community caretaking doctrine as follows:

> Under the Fourth Amendment, searches and seizures without a warrant are presumptively unreasonable, subject only to specifically established exceptions. Certain of these exceptions arise in the context of law enforcement and are related to the

- 22 -

detection, investigation and prevention of criminal activity, such as the exigent circumstances exception, the plain view exception, searches incident to arrest, consent searches, automobile searches, and the imminent criminal activity exception.

In addition to these crime-related exceptions, law enforcement officers legitimately perform community caretaking activities that also necessitate exception to the warrant requirement. The community caretaking doctrine has been characterized as encompassing three specific exceptions to the warrant requirement: the emergency aid exception, the public servant exception, and the automobile impoundment/inventory exception. Each of these exceptions contemplates that police officers engage in a wide variety of activities relating to the health and safety of citizens unrelated to the detection, investigation and prevention of criminal activity. Nevertheless, community caretaking activities must be performed in strict accordance with the Fourth Amendment.

[T]he emergency aid exception . . . permits police officers to make warrantless entries and searches when they reasonably believe that a person is in need of immediate aid. As with all of the community caretaking exceptions, actions by police pursuant to the emergency aid exception must be independent from the detection, investigation, and acquisition of criminal evidence.

***Commonwealth v. Davenport***, 266 A.3d 707, 709-10 (Pa. Super. 2021)

(citations and quotations omitted).

A warrantless intrusion under the emergency aid exception must be commensurate with, and limited to, the perceived need to provide immediate assistance. ***Commonwealth v. Wilmer***, 648 Pa. 577, 194 A.3d 564, 571 (2018). In other words,

the right of entry into the private dwelling by law enforcement officers terminates when either the necessary emergency assistance has been provided or it has been confirmed that no one inside needs emergency assistance. At that point, law enforcement officers must **leave the residence** unless some

other exception to the warrant requirement permits their continued presence.

*Id.* at 572 (emphasis in original).

Under the community caretaking doctrine, Trooper Adams properly entered Appellant's residence without a warrant to help if Appellant became violent while receiving emergency treatment from EMS paramedics for his overdose. The community caretaking doctrine, however, did not entitle Trooper Adams to shine his flashlight into the shoebox. ***Hagestedt*** is persuasive on this point. One of the officers in ***Hagestedt*** shined his flashlight into a small opening in a kitchen cabinet that was unrelated to the gas leak, a "deliberate action that was unrelated to his authorized intrusion." ***Id.***, 270 N.E.3d at 347. Similarly, Trooper Adams shined his flashlight into a hole in the shoebox, an act unrelated to his reason for entering the residence under the community caretaking doctrine, which was to provide help if Appellant became violent.

The Commonwealth insists that Trooper Adams' purpose in shining his flashlight into the shoebox was to assist EMS personnel, thus validating this act under the community caretaking doctrine. ***See*** Commonwealth's Brief at 51 ("Trooper Adams immediately recognized scramble pills; at that moment, the contents of the shoebox became important intelligence for EMS as to what [Appellant] overdosed on, and potentially how he overdosed on it. Opening the shoebox potentially reveals more clues that could help EMS treat [Appellant]") & at 52 ("Opening the shoebox to reveal its contents served an

essential function in that emergency aid – attempting to discern what [Appellant] used, and how he may have used it, to better help EMS render emergency services"). No evidence supports this thesis. Trooper Adams, the sole witness during the suppression hearing, admitted that he did not enter the residence to provide medical assistance, because he was not trained as an EMT, and because three EMS workers were already providing medical treatment to Appellant. Trooper Adams did not testify that EMS personnel needed to know what substance caused the overdose or asked him to find or identify this substance. Nor did Trooper Adams testify that he told EMS personnel what he found in the shoebox—testimony he naturally would have given had his role been to assist in medical treatment.

The sole reason that Trooper Adams gave for shining his flashlight into the box—"we go there to see what [the patient] overdosed on to possibly **make an investigation further**, anything that's **in plain view** that we can see," N.T., 3/16/23, at 10 (emphasis added)—was for the purpose of criminal investigation, not medical assistance. This was how the prosecutor and the trial court interpreted the trooper's testimony. The prosecutor argued that the trooper's conduct was proper under the plain view doctrine. *Id.* at 24-26. The prosecutor did not contend that the trooper shined his flashlight to provide medical assistance. Similarly, the trial court stated, "The issue in this case is limited to whether the shoebox with the round hole would be a situation where the plain view doctrine would grant an exception to the need for a search

warrant." *Id.* at 27. Thus, by searching the interior of the shoebox with his flashlight, Trooper Adams exceeded his authority under the community caretaking exception.

Finally, we consider whether the search of the shoebox was permissible under the "plain view" exception to the Fourth Amendment. We conclude that it was not.

The plain view doctrine authorizes a warrantless seizure of evidence when (1) the police must observe the object from a lawful vantage point; (2) the incriminating character of the object must be immediately apparent[10]; and (3) the police must have a lawful right of access to the object. *Commonwealth v. Graham*, 721 A.2d 1075, 1079 (Pa. 1998) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)). Since any evidence seized by police will be in plain view at the moment of seizure, the "question of whether property in plain view of the police may be seized therefore must turn on the legality of the intrusion that enables them to perceive and physically seize the property in question." *Graham*, 721 A.2d at 1079 (citing *Texas v. Brown*, 460 U.S. 730, 737 (1983)). "Plain view" provides grounds for seizure of an item

_____

[10] In other words, "the observing officer must have probable cause to believe the evidence in question is contraband or incriminating evidence"). *Saunders*, 326 A.3d at 897 (citations omitted). Probable cause exists "where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed." *Id.* (citations omitted).

when an officer's access to an object has some prior justification under the Fourth Amendment. "Plain view" is perhaps better understood, therefore, not as an independent "exception" to the warrant clause, but simply as an extension of whatever the prior justification for an officer's "access to an object" may be.

*Graham*, 721 A.2d at 1079 (citing *Brown*, 460 U.S. at 738-39). *Graham* observed that the plain view doctrine "establishes an exception to the requirement of a warrant not to search for an item, but to seize it." *Id.* at 1080. This distinction "highlights the principle that the plain view doctrine permits police officers to seize contraband that is in their purview if an independent justification gives the officer a lawful right of access to the item, but cannot, on its own, justify an officer extending his or her search for that item." *Id.*

Trooper Adams satisfied the first prong of the plain view test, observation from a lawful vantage point, because he was lawfully in the living room inside Appellant's home for a "community caretaking" function.

*Graham* and our Supreme Court's decision in *Commonwealth v. Norris*, 498 Pa. 308, 446 A.2d 246 (1982), help resolve the second and third plain view prongs. In *Norris,* two police officers heard loud music emanating from the defendant's apartment. The officers knocked on the door for several minutes and identified themselves before breaking down the door and conducting a limited search of the apartment. One officer seized a knife seen on a nightstand. The officers then thoroughly searched the bedroom and found a gun under a mattress. Our Supreme Court held that exigent

circumstances justified the forcible entry into and limited search of the apartment. Moreover, the plain view doctrine authorized the seizure of the knife on the nightstand, because the exigencies of the situation had already justified the intrusion into the bedroom where the knife was discovered. *Id.*, 446 A.2d at 250. The Court found, however, that the plain view doctrine did not authorize the search under the mattress and the seizure of the gun, because "[t]he gun could not have been seen without a thorough search of the bedroom. That search occurred after defendant was securely held and after it was apparent there was no one else in the apartment to endanger the officers." *Id.*

In *Graham*, a police officer realized that an arrest warrant was issued for one of three men he observed on a porch. He approached the group and directed the man who was the subject of the warrant to lie down. He then patted down one of the other men, the defendant, for weapons. After finding no weapons, the officer shined a flashlight down into the defendant's pocket and found a Lifesavers Holes container. The container later was determined to contain crack cocaine. Our Supreme Court held that the pat-down of the defendant was a valid search to protect the officer's safety, relying on *Terry v. Ohio*, 392 U.S. 1 (1968). The Court further held, however, that no justification existed for shining a flashlight into the defendant's pocket:

> [The officer] completed the search for weapons authorized under *Terry* before using his flashlight. The subsequent act of shining the flashlight was part and parcel of the search that put the contraband into plain view. Thus, the Commonwealth seeks to

use the plain view doctrine, not to validate seizing an already exposed object, but to justify an extended search and subsequent seizure of contraband discovered in the course of a *Terry* stop. Since the plain view doctrine cannot justify extending a warrantless search, we find that it cannot legitimize [the officer's] flashlight-aided search of [the defendant's] backpocket.

*Graham*, 721 A.2d at 1080.  The Court found these facts distinguishable from

*Commonwealth v. Burton*, 436 A.2d 1010 (Pa. Super. 1981), in which a

police officer shined a flashlight into the backseat of a car during a nighttime

search:

The [Commonwealth cites **Burton**] for the proposition that an officer lawfully in a position to make an observation may enhance his ability to see by the use of a flashlight.  **Burton** involved a police officer searching a car incident to a lawful arrest for possession of a handgun without a permit.  There, the officer shined his flashlight into the backseat, revealing contraband. The Superior Court found that seizure of the contraband was justified by the plain view exception even though the officer needed a flashlight to illuminate the contraband.  **However, the reasoning behind *Burton*, that a flashlight may properly illuminate items that would be in plain view during daylight hours, does not apply here, as the Lifesavers Holes container was not an exposed object.**

*Graham*, 721 A.2d at 1080 (emphasis added).

In the present case, Trooper Adams failed to satisfy the second prong of

the plain view test, because the object of the search, the closed shoebox, was

not immediately incriminating in appearance.  To the contrary, this container,

a mere shoebox, appeared completely innocuous, so there was no reason to

search inside it.  In other words, Trooper Adams lacked probable cause to

search the shoebox.  *Saunders*, 326 A.3d at 897 (equating second prong of

plain view test with probable cause).  Nor did Trooper Adams satisfy the third

prong because he lacked a lawful right of access to the scramble pills inside the container. The trooper was only present to provide help if Appellant became unruly during emergency treatment for a drug overdose. Under these circumstances, the trooper had no reason to shine his flashlight into the manufacturer's hole of the container, and there was no way for him to see the scramble pills inside the container without taking this unjustified step. Nor did the trooper possess a warrant to search the box or demonstrate probable cause under exigent circumstances that justified a warrantless search of the shoebox.

*Norris* and *Graham* support our decision. In both cases, police officers conducted an initial search that was proper under the Fourth Amendment. The items subsequently seized and suppressed were not in plain view despite the officers having a lawful right to be in the place searched. The present case is slightly different, because Trooper Adams did not enter the home to conduct a valid search but instead entered under the community caretaking doctrine. The initial search herein was Trooper Adams' flashlight search of the shoebox, which plainly was improper under the second and third prongs of the plain view doctrine. As in *Norris* and *Graham*, the proper remedy for this illegal search is suppression of the evidence seized during the search.

The Commonwealth cites multiple cases which held that the plain view doctrine was satisfied where a police officer shined a flashlight at night to illuminate objects that would have been plainly visible during daytime. *See*, *e.g.*, *Jones*, 978 A.2d at 1005; *Merkt*, 600 A.2d at 1299. We acknowledge,

as did *Graham*, that a police officer can shine his flashlight at nighttime to illuminate items that would be plainly visible during the daytime. This principle, however, does not apply here, because the scramble pills were in a closed container and would not have been plainly visible with or without the use of a flashlight had the room been dark and then illuminated at the time the shoebox was searched.

The Commonwealth argues that *Norris* and *Graham* are distinguishable from the present case because the officers in these cases moved or manipulated objects to reveal incriminating evidence that were not previously visible, while Trooper Adams did not move anything. We disagree. Although the officers in *Norris* and *Graham* moved or manipulated some object in order to find incriminating evidence, we know of no requirement that an officer **must** move or manipulate an object in order to invalidate a search under plain view principles. Furthermore, taken to its logical extreme, the Commonwealth's argument would allow police officers to search the interior of any object from a lawful vantage point, so long as the object had even the tiniest crack or perforation. Precedent does not allow for such an unlawful intrusion.

For these reasons, we hold that the trial court erred by denying Appellant's motion to suppress. We reverse the order denying suppression, vacate Appellant's judgment of sentence and remand to the trial court for further proceedings.

Order denying suppression reversed. Judgment of sentence vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judge Olson, Judge Dubow, Judge Kunselman, Judge Murray, and Judge Beck join the opinion.

Judge Bowes files a dissenting opinion, which Judge Nichols and Judge McLaughlin join.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 06/05/2026